ATTORNEY GENERAL, *ex rel.* HARWOOD, *v.* STILLSON.

108  419
120  595

1. ELECTIONS—MISCONDUCT OF INSPECTORS—EXCLUDING VOTE OF PRECINCT.

Electors are not to be deprived of the result of their votes by the mere mistakes of election officers which do not appear to have affected the result. But, on the other hand, where fraud appears upon the part of the inspectors, the voter must sometimes be deprived of his vote; and this must always be the case where mandatory provisions of the election law are disregarded, if the result would be thereby changed.

2. SAME.

In *quo warranto* proceedings to try title to a county office, it appeared that, outside of one township, the relator received a plurality of the votes cast; that, including the vote of said township, as canvassed, respondent had a plurality of 33; that, of the voters in said township who voted at said election, 150 were Hollanders, who were able to converse in their own language; that, before the polls were opened, the inspectors of election appointed a Hollander, who was opposed to the election of relator, to act as interpreter, and he was sworn to perform that duty; that he was thereupon permitted to be and remain, throughout the day, within the railing of the polling place, and to converse freely, in his own language, with said Holland electors, after they had received their official ballots, and before depositing or marking the same, although none of them had requested an interpreter, and the inspectors had not called upon him to act as such. *Held,* that the vote of the township should be thrown out.

*Quo warranto* by the Attorney General, on the relation of John Harwood, against Francis C. Stillson, to determine the title to the office of commissioner of schools for the county of Newaygo. On demurrer to the replication. Overruled. Submitted January 15, 1896. Decided February 26, 1896.

*Fred A. Maynard*, Attorney General (*George Luton* and *Michael Brown*, of counsel), for relator.

*A. F. Tibbitts* (*Martin Rozema*, of counsel), for respondent.

HOOKER, J. The relator was a candidate for the office of commissioner of schools in the county of Newaygo at the spring election of 1895. A certificate of election issued to Stillson, an opposing candidate, who entered upon the discharge of the duties of the office, and an information was filed, at the instance of the relator, to try the title to the office. It is before us on demurrer to the replication.

The replication alleges that the relator received votes to the number of 1,351, outside of the township of Sheridan, as against 1,148 for Stillson,—a plurality for relator of 203; and that, in that township, the vote as canvassed gave the relator 42 votes, and Stillson 278 votes. The replication alleges that, of the voters in Sheridan township who voted at the election, 150 were Hollanders, who were able to converse in their language; that, before the polls were opened, the inspectors of said election appointed one John Karnemaat, who was opposed to the election of the relator, to act as interpreter at the election, and he was sworn to faithfully discharge the duties of such interpreter; that he was thereupon permitted to be and remain, throughout the day, within the railing of the polling place, and he was permitted to, and did, freely converse with the electors who came therein, for the purpose of voting, after such electors had received their official ballots, and before marking or depositing the same; that such conversation was in a for-

eign language, viz., the Holland language; that, of the
150 Hollanders who voted at such election, no one re-
quested an interpreter; and that said inspectors in no in-
stance called upon him to act as such.

The above diagram, showing the polling place, was
attached to the replication, and a statement of the votes
for the office of regent was given, which shows that, in

the township of Sheridan, the candidate for regent upon the ticket upon which relator's name appeared received 176 votes, while his competitor upon Stillson's ticket received 102 votes. The replication asserts that such votes were illegal and void, and that the vote of the township should not have been counted, and that the respondent fraudulently and unlawfully holds the office.

It is plain that relator's right to the office depends upon the exclusion of the entire vote of the township of Sheridan, and the question of the validity of such vote is raised by the demurrer to the replication. Two questions are involved in the case:

1. Were the ballots of such voters as Karnemaat conversed with void, so that they should have been excluded?

2. If so, inasmuch as it cannot be ascertained how they voted, should the vote of the township have been excluded from the canvass?

We have frequently held that "electors are not to be deprived of the result of their votes by the mere mistakes of election officers, when such mistakes do not indicate that the result has been changed thereby;" and many things may occur that can be treated as irregularities. See *People* v. *Avery*, 102 Mich. 572, and authorities cited. On the other hand, where fraud appears upon the part of the inspectors, the voter must sometimes be deprived of his vote. *Attorney General* v. *McQuade*, 94 Mich. 439. And this must always be the case where mandatory provisions are disregarded, if the result would be thereby changed.

The statute in question[1] is one which was passed under a clause of our Constitution which emphasizes the necessity of measures for the promotion of purity at elections. It supplanted a law which permitted a voter to vote openly any ballot that he might choose. There was no obstacle to the immediate presence of any number of persons. We should be careless observers of current events,

[1] Act No. 190, Pub. Acts 1891, as amended by Act No. 202, Pub. Acts 1893.

did we not know and recognize the circumstances, of a public character, preceding and attending the agitation and adoption of measures designed to correct the palpable evils connected with our elections as formerly conducted. We must admit that the legislature intended, and the public understood, that thereafter ballots should not be prepared, by the voter or others, before the elector reached the polling place, and that, when he reached there, he was not to be annoyed by importunities or more potent influences calculated to affect or prevent his free, untrammeled action. To this end, expensive booths and utensils were provided, and "a lawful fence" required to remove nim from his fellows. It is now claimed that this is directory, and, unless the injured party can show that a radical departure from the plain provisions of the law actually resulted in a loss of votes to the relator, and a consequent change of result, there is no occasion to disturb the result as declared; and the reason alleged is, not that there is no probability that the relator has suffered, but that he must submit to a probable wrong, lest some voters not responsible should lose their votes.

We are not disposed to question the rule laid down in *People* v. *Avery* where there is a reasonable opportunity for applying it; but, on the other hand, we think that the possible loss of votes is not the greatest calamity that can follow improperly conducted elections. We are not sufficiently credulous to suppose that an election board could be so ignorant as not to know that the law was transgressed by the course permitted in this case; and, unless we are to put a premium upon such conduct, and invite its repetition throughout the State, we must conclude that some of the voters must lose their votes, through their offending officers. The readiest way to stop fraud and corruption at elections is to see to it that the same is not rewarded by success; and when, by the connivance and procurement of the election officers, the law is, in essential particulars, disregarded, so that candidates and voters lose the benefit of its protective provisions, under circum-

stances well calculated to produce the belief that such conduct may have changed the result from what it would otherwise have been, there is as great danger of wrong to the individual voter through counting, as excluding, the vote of the precinct. If we were to suppose a case where the booth was dispensed with, or where persons were allowed in the booth with all electors, it would be possible that no fraud was perpetrated, and that the result was in no way affected thereby; but, in the face of the law, such a practice would be only less surprising than such a result, for we all know that there could be but one object for such course. In such a case no one would contend that the election would be valid, and that the vote of the precinct should be counted. The provisions of the law would be held mandatory, and we think they should be in this instance. The law has attempted to provide uniform and strict regulations for elections. While we are not prepared to say that the vote of a precinct should be thrown out for a failure on the part of the inspectors to attain absolute perfection in the conduct of an election, where, as in this case, the whole body of electors have been subjected to the possibility of a forbidden influence, and a large portion are shown to have been approached in forbidden ways, under circumstances strongly indicating a fraudulent design, the vote of the precinct should be thrown out, if the result would be thereby changed.

The demurrer must therefore be overruled, and the respondent allowed 10 days within which to file a rejoinder.

The other Justices concurred.