JESSE J. DUNN,
SAMUEL W. HAYES,
JOHN B. TURNER, } Justices.
R. L. WILLIAMS,

RAMPENDAHL v. CRUMP.

No. 271.   Opinion Filed November 9. 1909.

(105 Pac. 201.)

1.   ELECTIONS—Ballots—Deposit—Mandatory Statutes.   That part of section 4 of chapter 17, p. 233, of the Session Laws of Oklahoma Territory of 1905. which provides that on leaving the booth the voter shall "deliver the ballots to the inspector or judge temporarily acting as inspector, and such inspector shall forthwith, in the presence of the voter and members of the election board and the watchers, deposit same in the respective ballot boxes," is mandatory.

2.   ELECTIONS—Contest—Gross Irregularities—Rejection of Precinct.   When it appears that practically not only every manda-tory but also every directory provision of the laws governing the holding of the election, except that relating to time and place have been flagrantly and willfully violated in a precinct, and the integrity of the result of such election is left in grave doubt,

and the trial court thereby rejects the ballots cast at such precinct, his action will not be disturbed on review in this court.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; D. A. Richardson, Judge.*

Election contest by W. F. Rampendahl against W. J. Crump. Judgment for defendant, and plaintiff brings error. Affirmed.

*A. A. Davidson* and *George A. Murphey,* for plaintiff in error, —Citing: *Gillaland v. Schuyler,* 9 Kan. 569; *Stockpole v. Hallahan* (Mont.) 28 L. R. A. 506; *Jones v. State* (Ind.) 55 N. E. 229; *McClelland v. Erwin* (Okla.) 86 Pac. 283; *State v. Russell* (Neb.) 33 Am. St. Rep. 625; *Fry v. Booth,* 19 Ohio St. 25; *Clelland v. Porter* (Ill.) 24 Am. Rep. 273; *DeBarry v. Nicholson* (N. C.) 11 Am. St. Rep. 767; *Williams v. Soudy* (Wash.) 41 Pac. 169; *Holland v. Davis,* 39 Ark. 549; *People v. Avery* (Mich.) 61 N. W. 5; *Patton v. Watkins* (Ala.) 90 Am. St. Rep. 43; *State v. Sillom,* 24 Kan. 13; *Parvin v. Winberg* (Ind.) 30 Am. St. Rep. 257; *Bowers v. Smith* (N. Y.) 33 Am. St. Rep. 491; *State v. Saddler* (Nev.) 83 Am. St. Rep. 573; *Roberts v. Calvert* (N. C.) 4 S. E. 127; *Tarbox v. Sughrue,* 36 Kan. 225; 15 Cyc. 370, 371; *Williamson v. Musick* (W. Va.) 53 S. E. 706; *Bingham v. Broadwell* (Neb.) 103 N. W. 323; *Chadwick v. Melvin,* Brightley's Election Cases, 256; *Ransom v. Black,* 54 N. J. L. 446; *Sanders v. Prentice,* 28 Wis. 358; *Daly v. Petroff,* 10 Phila. 389; *Hall v. Schonecke* (Mo.) 31 S. W. 97; *Clark v. Robinson,* 88 Ill. 498; *Russell v. McDowell* (Cal.) 23 Pac. 183; *O'Laughlin v. City of Kirkwood* (Mo.) 81 S. W. 512; *Hundley v. Bowman* (Minn.) 84 N. W. 1002; *Perry v. Hackney* (N. D.) 90 N. W. 483; *Wenworthy v. Mast* (Cal) 74 Pac. 841; *Gass v. State,* 34 Ind. 425; *Abbott v. Hartley,* 77 Pac. 410.

*De Roos Bailey, S. M. Rutherford, J. E. Wyand,* and *Thomas H. Owen,* for defendant in error.—Citing: *Attorney General v. McQuade,* 94 Mich. 439; *Attorney General v. May,* 99 Mich. 539; *Blue v. Peter,* 20 Pac. 442 (Kan); *London v. People,* 26 Pac. 135 (Col.); *Tebe v. Smith,* 49 Am. St. Rep. 68; *Major v. Booker,*

99 Kan. 305; *Kirkpatrick v. Board of Canvassers,* 44 S. E. 465; *People v. Bd. of County Canvassers* (N. Y.) 14 L. R. A. 624; *Attorney General v. Stilson,* 108 Mich. 419; *Attorney General v. Kirby,* 120 Mich. 592; *Rhodes v. Driver,* 64 S. W. 272; *Mauck v. Brown,* 81 N. W. 313; *Freeman v. Lazarus,* 61 Ark. 253; *Patton v. Coates,* 41 Ark. 111; *Jones v. Glidewell,* 53 Ark. 162; *Mann's Case,* 2 Phila. 320; 6 A. & E. Enc. L. 353.

WILLIAMS, J. This case grows out of the election held on September 17, 1907, for the purpose of ratifying or rejecting the Constitution for the proposed state of Oklahoma, and the election of state, county, and township officers. The plaintiff, who is also the plaintiff in error in this court, in his petition filed on December 31, 1907, and as amended March 3, 1908, alleges: That both plaintiff and defendant were candidates for the office of county attorney of Muskogee county; that their names appeared upon the official ballots; that said county was divided into 30 election precincts, an election being held in each, and votes were received by both plaintiff and defendant for said office in each precinct; that the total number of votes cast in said precincts was 7,213, plaintiff receiving 3,681 and the defendant 3,532; that the plaintiff was thereby elected to said office; and that the majority of the board of county commissioners rejected the returns from certain voting precincts, to wit, Yahola, Taft, and Ft. Gibson; that an abstract of said votes was made by said commissioners and filed with the county clerk of Muskogee county in the remaining 27 precincts; that said county commissioners issued to the defendant election certificates; and that he intruded into said office and withholds the same and the fees thereof from the plaintiff. The division of said county into 30 precincts and the holding of election in each excepting Yahola, Taft, and Ft. Gibson is admitted by the defendant. All other allegations are by him denied. The defendant further alleges that the elections in the precincts of Taft and Yahola were invalid and illegal because of certain misconduct, and that the votes cast therein should not be counted. On the trial it was agreed that the total number of votes received by the plaintiff in

the 27 uncontroverted precincts was 3,016, and by the defendant 3,257, and the issues there tried involved only the votes cast for the plaintiff and the defendant in Ft. Gibson, Taft, and Yahola precincts, and the validity of the election in the two latter. The trial court found: That the plaintiff received 331 votes in the Ft. Gibson precinct, and the defendant 211 votes, and such votes should be counted; also, that the election in the Yahola precinct was valid, and the plaintiff had received in such election 111 votes, and the defendant 30 votes; that at the election in the Taft precinct the plaintiff received 195 votes, and the defendant 5 votes; that the election in said precinct was invalid; that such votes should not be counted; and that plaintiff thus received at said election in said county 3,458 and the defendant 3,498 votes, and awarded the office to said defendant. As the only action of the trial court that is urged by the plaintiff in error in this court as being erroneous is that relating to Taft precinct, it obviates the necessity of adverting to the ruling of the *nisi prius* court as to Yahola or Ft. Gibson precincts.

The following questions are necessary to be determined:

(1) As to whether or not section 4 of chapter 17, p. 233, of the Session Laws of Oklahoma Territory of 1905, which provides that, on leaving the booth, the voter shall "deliver the ballots to the inspector or judge temporarily acting as inspector, and such inspector shall forthwith, in the presence of the voter and the members of the election board and of the watchers, deposit the same in the respective ballot boxes," is mandatory.

(2) If mandatory, whether or not the flagrant disregard of said mandatory provision in connection with the willful disregard of practically every other provision of the law relating to the holding of such election, except that as to time and place, justified the trial judge in holding the election of said precinct invalid and rejecting all the votes thereof.

Lee Duncan testified on behalf of the defendant, in substance, as follows: That he was inspector of the election which was held in a building 10 by 12 feet. That there was a door in the east end of the building, and windows on the north and south side of the

building. . That in order to keep the voters back they stretched ropes on each side of the door forming a chute, the entrance to which was 50 feet from the door. That ropes were also stretched on each side of the house. That there were two booths in the house, one in the northeast and one in the northwest corner. That one of the panes and half of the other was out of the lower sash, thus leaving the window open. That the crowd was instructed to remain 50 feet from the building; but they absolutely refused to do so. That they were cursing and yelling around there, and in an hour or so after the polls were open the ropes were all down. The challengers were standing at the door, and that the crowd finally got so rough that one of the challengers would not stand outside, and that an officer was appointed to keep them out of the house; the officer's name being Tom Williams. That the voters crowded right around the door, and Williams had to shove them back all the time. That at times the crowd was standing at the north window, and at times they would force themselves into the house. That three or four voters would be inside the house, while two voters were in the booths. That the voters would often come out of the booths with their ballots open. That when they were instructed to return into the booths and fold their ballots they would sometimes do so, and at other times would not. That often the voter handed his ballot to Stout Ham, who would put the ballot in the box. That Stout Ham, who was the pollbook holder, received about two-thirds of the ballots, some of which he put in the box himself, and some of which were handed to Duncan by Stout Ham. That all through the day the voters at the door and north window would say: "Vote her straight, stamp under the eagle." There were 150 to 200 people around the door and window. A notary public from Muskogee stationed himself right at the window. That he had him removed by the officers two or three times. That he stayed at the window two or three hours and ran in the house three or four times. One time he said he had orders from Muskogee to hurry up the election. That one of the clerks would frequently go into the booths with a voter who wanted instructions and would stay in there until the voter made out his ticket.

That the booths were about three feet from the window. That, when he first commenced trying to get the judges and clerks that morning, a committee came to him and demanded that they should use them for judges and clerks, stating that: "The damned Democrats ought not to be allowed to hold an election when they were all niggers, and they would have to commence now if they ever got anything in the future." That because of these remarks it was impossible for him to get Democrats to serve as judges and clerks. They claimed they were afraid there would be trouble. That after the crowd got so rough some 10 or 15 white men left without voting. This was after the polls were open, however. They claimed they were afraid to stay, said they would not serve as judges and clerks, and that they were afraid to try to vote. That only 7 white men voted at this election. That during the day one of the challengers came inside and said a man outside had threatened to cut him in two, and refused to stay outside any more. That the pollbook holder stayed in the house all during the day, as well as both challengers, after some one had threatened to cut Lee in two. That the window on the north side was about three feet wide. That he had crawled through there where the glass was out. That he thought the sash was down all day, but that the panes were out. That he broke the panes about a year before to get into the room. That the booths where the voters entered were about three feet wide. That when the voters came in to vote they were not always orderly. That when they would time a man in the booth and ask him to come out he would say he knew what he was doing and would stay as long as he pleased. That this occurred often, some 50 or 100 times. That one man stayed in the booth 14 minutes, and they would always give back some rough answer. That he had no trouble with any one during the day, but thought if he had gone outside he would have had. That some of them on the outside threatened him, but he did not know who they were. That they had trouble with a man by the name of Carver, who refused to leave the house after he had voted. That John Morris was one man who swore when he was ordered to get out of the booth. That he said he would get out when he got God damned good and ready.

That he (Duncan) did not think there were so many negroes in that precinct. That he lived there three years and only knew 25 or 30 of those who were at the election. That after the ropes were torn down they remained down all day. That the voters would often double their tickets just once, and sometimes not at all, and would give them to Stout Ham. That he objected to the ballots being delivered to Stout Ham, making the objection both to Stout Ham and the voters. That Stout Ham was willing not to receive the ballot, but that the voters would not give them to him (Duncan). That he told Stout Ham it was not lawful, but that he just went ahead. That he did not object every time, for the reason that a man will get tired after a while when he can do no good by objecting. That he was present all the time. That John Morris and Felix Drew were intoxicated that day. That several others were drinking. That he did not see them drink, but that they were drunk and staggering around there. That there were so many of them he did not know how many. That the notary public came in the house three or four times. That the last time he came in he said he was told we would not let the clerks go into the booths and make out a man's ticket. That the notary was told that he only objected to the clerk's going in with voters who could read and write, that the voter who could read and write should take his instructions and go in and vote, and that it was not lawful for the clerk to make out his ticket for him. That he knew a good many white men who came there to vote and went away without voting. That these parties stated they were afraid to vote, but would vote the Democratic ticket if they were to vote. That Daniels, Parks, and Clerk were of this number. That he does not remember the other names. That he made no objection to the challengers' staying on the inside after they were threatened on the outside. That several times there were more than three voting in the room, and one time about four rushed in where there were two in each booth already. That it was not a peaceable crowd. That the voters were threatening to turn over the house the judges were in, and every little while some one would give an Indian whoop. That the reason he did not keep the ropes up after they

were torn down was because he was afraid to go outside. That when a voter did not understand making out his ticket, and would want one of the clerks to go into the booth and make it out for him, he would object, but that in the afternoon one of the clerks simply got to going in with every one who wanted instructions. That this clerk was Flave Glenn. That some of the persons hollowing "Vote her straight, stamp under the eagle," were standing with their faces right in the window, and some right at the door. That while this was going on voters were in the booths voting, and as a voter would go into the booth these parties would hollow, "Vote her straight, stamp under the eagle." That he never objected to clerks making out tickets for those who could not read and write, but only those who could read and write. That he objected each time this was done. That he could not tell the number of voters who were assisted in voting who could read and write, but that there were more than a dozen or fifteen, but that he could not tell how many, but that it was done often. That this occurred off and on all during the day, and that toward the last it was a continuous thing.

W. N. Lonewolf, in behalf of defendant, testified, in substance, as follows: That he was at Taft on the day of the election. That he is a Kiowa Indian, and was candidate on the Republican ticket for township clerk. That he was there all day. That ropes were stretched in front of the door forming a chute, the entrance of which was 50 feet from the door, and ropes were stretched on each side of the house. That the people around there were saying a good many very ugly things; were swearing, using ugly words, and whooping. That he did not see any one taking a drink, but that drinking was going on. That there was a cry, "Bring the Democrat out." That these disturbances were pretty well throughout the day. That the ropes were all torn down, and the people crowded right around the door and the north window. That while at the door and window he heard them say: "Vote her straight, stamp under the eagle." That at one time he saw as many as 20 people at the north window. That quite often during the day he saw as many as 5 or 6 persons in the room, besides the election

officers. That he saw a notary public from Muskogee in the house a number of times. That after a Mr. Carver had voted he declined to leave the house, and that he (Lonewolf) pulled him out. That Mr. Duncan told him (Lonewolf) to help him all he could to keep the boys outside. That he put the ropes up in the morning before they began to vote. That they stayed up, perhaps, for two hours. That he tried to keep the ropes up. That they were down and up all day; except in the afternoon he let them alone, and they were down the greater part of the time. That the crowd tore them down by pushing over them. That the crowd was lined up at the polling place around the door, and the voters had to squeeze in and out often. That the voters did not wait to be called to go in and vote, but a great many would go in before any one was called. That they were worse in the evening. That he voted the last hour. That he did not stand in line. That he was standing in the door helping the notary make a list of those who did not vote. That he had been standing there quite a while writing such names; that is, the names of those who did not get to vote. That he had written down his own name, and the challenger said one man more can vote, and that he jumped in and voted. That he knew of persons who had trouble in getting in to vote and went away without voting. That two of these persons were Daniels and Parks. That he did not know the others. That the notary first stationed himself near the window, and that he moved him away to about 20 or 30 feet from the house. That he put the people away from the window and came very near having a fight on account of it. That the window was open. That T. C. Cunliff, who was a candidate for township treasurer, refused to go away, and sat down right under the window. That the others would go away generally when they were told, but would come right back again. That there were people, who were drinking, and that it was the toughest crowd he was ever in. That they used the ugliest kinds of words, and all kinds of names. That he was constantly driving the people away from the north window when he was on the side of the house, but they would come right back.

Stout Ham testified on behalf of the defendant, in substance, as follows: That he was pollbook holder at the election held at Taft on September 17, 1907. That he was there before the election opened, and stayed there until the polls were closed. That he was in the house where they were voting all day. That it was about half past 9 before they got in to voting. That when they got straightened out they had the rope stretched out in front and started to voting. That the principal part of the crowd stood in front of the house, some of them right at the door, and some a little farther back, and some around the north window. That he heard some pretty loud talking. That he heard one party tell Johnson Lee if he would come out of doors he would cut his guts out. That Johnson Lee was one of the officers of election. That he noticed the notary public in the house twice during the day, and noticed him just in front of the door in conversation with other people. That this might have occurred 25 feet from the door, maybe not so far. That some of the voters brought their tickets from the booths folded, and some not folded, but open. That they handed a good many of the ballots to him, and some to Mr. Duncan. That he could see how a great many of the voters voted. That when they would come out with the ballots open, and would get close enough so he could see, that he would look and see which way they had voted. That sometimes there would be four or five voters on the inside of the room, outside of the election officers. That he heard some men talking like they might have been drinking. That he did not know who he was acting as pollbook holder for, but that he was a Republican in politics. That he heard talk from the outside that all the officers were Democrats, and that they were going to do away with the election. That the ropes did not stay up all day. That they were thrown down or walked over. That its seemed to him like the north window was up. The there were some people who hung around that window a good deal. That the officers would tell them to go away; but they would come back. That Bob Robinson came in and voted and handed him his ticket, saying that he did not want no damned Democrat to put his hands on it. That he handed it to Mr. Dun-

can. That a good many ballots were open so that he could see them. That it got to be pretty constant. That he would con-stantly hear from the outside the words, "Vote her straight." That they were talking to the ones coming in to vote. That this talk-ing was near the door.

J. P. Davidson testified on behalf of defendant, in substance, as follows: That he was at Taft on the day of the election. That he got there about 9 o'clock. That there were about 95 men around there and several in the house. That they kept coming and gathering up in front of the door. That several looked like they were drinking. That they were talking and swearing about the stamps not being there; said it was a lot of Democrat lies. They kept carousing around there and making the threat that no "God damned Democrat could vote there." That one of the voters came to him and said, "I heard you was a Democrat." That he asked the voter what business it was to him, stating that he would vote for whom he pleased. That finally they got down quieter and was telling how the Democrats treated them in the states and that finally a man hollowed they had found the stamps and the crowd rushed up to the rope. That he saw there was a good chance for a row and stayed away. That they commenced voting, and finally Johnson Lee said it was dinner time, and they would go to dinner and come back again. That they called him, and he took his boy and went in and voted. That when he went in the house one fellow said, "He is a damned Dem-ocrat." That after he voted he went home. That he was there at the election two or three hours. That he did not stay longer be-cause he thought there would be a row. That the crowd was con-stantly swearing and seemed to be drinking whisky. That they were swearing and cursing, and asked him if he did not want to drink, and he told them, "No." That about half a dozen people were cursing and swearing as they went through the crowd, stat-ing that no damned man could vote the Democrat ticket there that day. That Bob Robinson was one of these men. That Robinson had been drinking. That this talk was all within 30 feet of the house and was kept up for three hours, all the time the witness was

there. That he came away before the trouble, but heard they had a row after he left.

· Ben Collins testified on behalf of defendant, in substance, as follows: That he was at Taft on September 17th for a short time in the evening. That when he got there the people were crowding all around the room and door so he could not get in at all. That he waited until he could get in and went in and voted. That they were still standing there when he came out. That he saw a notary public taking the names of people on the outside. That the notary came to him 8 or 10 feet from the door and said he wanted to get the names of people who did not get to vote. That there were three in the room with him, outside of those in the booths and the election officers.

W. N. Howell testified on behalf of the defendant, in substance, as follows: That he was city marshal of Taft. That he was one of the watchers at the election at Taft on September 17th. During the day there were parties at the window talking about the election. That they asked them to move away, and they did not do so. That they were asked to leave the second time. That they finally left the window, but came right back. Among this crowd was a notary public who had a small table at the window. That Lee went out and talked to some of them about getting back the proper distance, and they had some words about it, and they talked about what they would do to him; said he would cut his guts out if he would come out there. That the crowd was all around the building. That sometimes they would get them back. That the ropes were knocked down, and that he does not think they were up after 4 o'clock at any time. That the notary came in the house three times. That the notary had his box right in the window at first, and later moved it 10 or 15 feet from the window and stayed there all day. That one pane and part of another was broken out of the north window. That he tried to get them to leave the windows. That they would not do it, and said that he could come out and get them away. That he told them he did not have time to fight. That he did not go out because he apprehended danger. That some of the voters came from the booths with their ballots open,

and some folded inside out, showing the face of the ticket. That some four or six ballots were marked with pencil, instead of stamp. That all the election officials except Duncan were Republicans.

Tom Williams testified on behalf of the plaintiff, in substance, as follows: That he was an officer at the election held at Taft on September 17, 1907. That his duties were to keep people outside of the ropes. That he had a hard time toward the last to keep them back. That he would tell them to get back, and they would crowd up again. That he moved people away from the window three or four times along late in the evening, but could not keep them back. That he put his feet in the door to keep them out. That they would break the ropes down, and he would put them back. That finally he quit trying to keep the ropes up. That late in the evening they were crowding up at the door, and he did not have time to keep them away from the window. That when he would fix up the rope they would bear in and break the stob down. That he told Mr. Duncan in the evening he was not going to try to keep the people back. That he could not do anything with them; they would get back and come back again.

1. Section 4 of chapter 17, p. 233, of the Session Laws of 1905 provides:

"When a voter shall have passed by the challengers, or shall have been sworn in, he shall be admitted to the election room, but not more than three voters shall be allowed in the room at one time. On entering the room the voter shall announce his name to the poll clerks who shall register it on the poll books. The clerk holding the ballots shall deliver to him one of each kind of ballots to be voted at such election, and the clerk having the stamps shall hand one to him, and on request of any elector, the clerk shall instruct such as to the manner of voting, and by consent of a majority of the board the voter may call in an interpreter to assist him in making known his desires to the board. The voter shall then and without leaving the room go into any booth which may be unoccupied and indicate the candidates for whom he desires to vote by stamping a cross in the square immediately to the left of their names, and indicate his preference on any question or constitutional amendment or other special matter by stamping in the square immediately to the left of and preceding the words 'yes'

or 'no' under such question; provided, however, that if the voter shall desire to vote for all the candidates of one political party or group of petitioners, he may stamp a cross in the circle which is under the device and in the column above the candidates of the party or group for whom he desires to vote, and such ballot when so marked shall be counted as a straight ticket for all the candidates in the column under said circle. Before leaving the booth or compartment the voter shall fold his ballots separately, so that no part of the printed matter on the ballots shall be exposed, and on leaving the booth or compartment shall return the stamp to the poll clerk from whom he received the same, and deliver the ballots to the inspector or judge temporarily acting as inspector and such inspector shall forthwith in the presence of the voter and members of the election board and of the watchers, deposit the same in the respective ballot boxes, the territorial ballot in the red box and the local ballot in the white box, and the clerks shall write the word 'voted' after the name of the voter on the poll list, and the voter shall then pass out of the room."

As to whether or not the failure of the voter to deliver the ballots to the inspector or judge temporarily acting as inspector, but willfully giving same to the pollbook holder, renders such ballots invalid, makes it necessary to determine whether or not such provision is mandatory. In connection with such duties as are imposed by said section upon the voter, we call attention to the provision of section 2961, Wilson's Rev. & Ann. St. 1903 (section 56. c. 33), which provides that:

"* * * No person except an inspector of election or judge who may be temporarily acting for him, shall receive from any voter a ballot prepared by him for voting. * * * Whoever shall violate any provision of this section shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment in the penitentiary for a period not exceeding five years, or by a fine not exceeding three hundred dollars, or by both such fine and imprisonment, at the discretion of the court."

Obviously the lawmakers, by specifically placing such duty upon the voter, and imposing the penalty of felonious punishment upon any one unauthorized interfering, by receiving the ballot, intended such provision to be mandatory.

The proof shows: That Stout Ham, the pollbook holder, received many of the ballots; that the inspector objected to Stout

Ham receiving the ballots, such objection being made not only to Stout Ham, but also to some of the voters; that Stout Ham, the pollbook holder, said that he was willing not to receive them; that the voters, however, would not give the ballots to the election inspector, but to Stout Ham, the pollbook holder. The proof, however, does not show how many voters refused to give their ballots to Duncan, the election inspector, but persisted in giving them to Stout Ham. Over two-thirds of them, however, were given by the voters to Stout Ham, and not to the election inspector, and over half of them were put in the election box by Stout Ham himself, and not by the inspector. We quote from the brief of the plaintiff in error, as follows:

"To be more explicit, it may be said that there are three elements in a popular election: First, those acts which have reference to the ballot and to the voter himself performing the act of voting; second, acts of officials and others in operating the election machinery; third, acts which have reference to the conduct of bystanders or others and not involving the voter, as such, or the election officials. The provisions of law with deference to the acts embraced within the first element are, of course, mandatory because they affect directly the ballot itself and the act of voting, the very essence of the law. The voter alone is involved, and he must act as the law prescribed or suffer the consequence. Such imperative provisions relate to the form and preparation of the ballot, to the marking of the ballot to indicate the voter's choice, to marks made by the voter to distinguish his ballot from others, to the manner and the conditions upon which illiterate and disabled voters shall be assisted in marking their ballots, all of which provisions go to the root and essence of the thing to be accomplished and necessarily affect the integrity of the ballot because, of course, the efficacy given to the casting of a vote by ballot is derived solely from legislative enactment."

This statement by counsel for plaintiff in error, as far as it goes, seems to be in accord with the weight of authority. Mr. McCrary, in his work on Elections (section 724), says:

"The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and, on the other, of relieving him from the consequence of a failure on the part of election officers to perform

their duties according to the letter of the statute where such failure had not prevented a fair election. The justice of this rule is apparent, and it may be said to be the underlying principle to be applied in determining this question. The requirements of the law upon the elector are in the interest of pure elections, and should be complied with at least in substance; but to disfranchise the voter because of the mistakes or omissions of election officers would be to put him entirely at the mercy of political manipulators. The performance by the election officers of the duties imposed upon them can be reasonably well secured by providing a penalty for failure so to do."

See also, *Attorney General v. May,* 29 Mich. 538, 58 N. W. 483, 25 L. R. A. 325; *Attorney General v. McQuade,* 94 Mich. 439, 53 N. W. 944; *Attorney General v. Stillson,* 108 Mich. 419, 66 N. W. 388; *Attorney General v. Kirby,* 120 Mich. 592, 79 N. W. 1009; *State ex rel. Braley et al. v. Gay,* 59 Minn. 6, 60 N. W. 676, 50 Am. St. Rep. 389; *Vallier v. Brakke,* 7 S. D. 343, 64 N. W. 180; *Spurgin v. Thompson,* 37 Neb. 39, 55 N. W. 297; *State v. Russell,* 34 Neb. 116, 51 N. W. 465, 15 L. R. A. 740, 33 Am. St. Rep. 625; *Tebbe v. Smith,* 108 Cal. 101, 41 Pac. 454, 29 L. R. A. 673, 49 Am. St. Rep. 68; *Lay v. Parsons,* 104 Cal. 661, 38 Pac. 447; *Kirk v. Rhoads,* 46 Cal. 398; *Taylor. v. Bleakley,* 55 Kan. 1, 39 Pac. 1045, 28 L. R. A. 683, 49 Am. St. Rep. 233; *Curran v. Clayton,* 86 Me. 42, 29 Atl. 930; *Wiltam v. Zahorik,* 91 Iowa, 23, 59 N. W. 57, 51 Am. St. Rep. 317; *Parvin v. Wimberg,* 130 Ind. 561, 30 N. E. 790, 15 L. R. A. 775, 30 Am. St. Rep. 254; *People ex rel. Nichols v. Board of County Canvassers,* 129 N. Y. 395, 29 N. E. 327, 14 L. R. A. 624.

No good reason has been advanced as to why we should not follow the decided weight of authority, and we, accordingly, hold that that portion of section 4 of chapter 17 of the Session Laws of 1905, providing that the elector shall deliver the ballot to the inspector or judge temporarily acting as inspector, is mandatory, and that where such mandatory provision is violated by the elector, and there does not appear to have been a reasonably fair effort by such elector to comply with such provision, such ballot is not subject to be counted, but will be rejected.

2.   The question further arises as to whether or not the action of the lower court is erroneous in rejecting all the ballots voted at such precinct. · The court found that the voters themselves at said precinct flagrantly and willfully violated not only the letter, but also the spirit and the intent, of the law; that almost every provision of the statute relating to the holding of elections, except that relating to the time and place merely, was flagrantly and willfully violated, and there is an abundance of evidence in the record to support such finding.

In the case of *Tebbe v. Smith,* 108 Cal. 101, 41 Pac. 451, 29 L. R. A. 673, 49 Am. St. Rep. 68, *supra,* the court said:

"It is the rule that mandatory provisions for the holding of elections must be followed, or the failure will vitiate it, while the departure from the terms of a directory provision will not render it void, in the absence of a further showing that the result of the election has been changed or the rights of the voters injuriously affected thereby.  Code Civ. Proc. § 1112; *Russell v. McDowell,* 83 Cal. 70, 23 Pac. 183.  But the rule as to directory provisions applies only to minor and unsubstantial departures therefrom. There may be such radical omissions and failures to comply with the essential terms of a directory provision as will lead to the conclusive presumption that the injury must have followed.  A substantial compliance with the terms of directory provision is, after all, required, and such a substantial compliance is not had by strictly following some provisions, while essentially failing to observe others. There must be a reasonable observance of all the prescribed conditions.  It is the duty of the courts so far to adhere to the substantial requirement of the law in regard to elections as to preserve them from abuses subversive of the rights of the electors."

In *Re Duffy,* 4 Brewst. (Pa.) 531, Judge Harding said:

"Much has been said in the argument on both sides concerning various provisions of the election law, which are claimed to be directory merely and, though counsel have pressed their respective views upon our consideration with great zeal and ability, still we cannot accord to them, either on the one hand or the other, hardly a semblance of assent.  On the contrary, we hold that the election law in all its parts means something, and that there is no warrant in  precedent or common sense for disregarding it partially or *ad libitum.*   The day has gone by when the 'directory plea' can be used as a shield to defend or excuse election officers who have dis-

regarded the law. In *Boileau's Case, supra* (2 Parsons, 503), Judge King said that the court 'would not hesitate in setting aside an election where they were convinced that in conducting it the laws of the commonwealth had been infracted.' In the *Penn District Case,* 2 Parsons, 526, an election was vacated entirely on the ground of irregularity. The irregularity was a material one, it is true, namely, closing the polls at an earlier hour than provided by the statute; but we cite the case as authority to rebut and to do away with the erroneous and widespread notion that nothing less than actual fraud will avail to set aside an election."

In *Mann's Case,* 2 Phila. (Pa.) 320, Judge Thompson said:

"The design of the law, in requiring the election papers to be filed by the officers of the election, is to afford the highest evidence by which the true vote at every election may be ascertained. These returns are considered *prima facie* as true. They are made by sworn officers, and the most stringent provisions are enacted to insure their correctness and to prevent their falsification. This law seems to contemplate that in the investigation of a contested election, these papers and documents may be made use of, as affording an important means of proof, and special power is given to the court to compel their production for that purpose. This species of evidence, when produced, must be judged of by the same rules which apply to other kinds of documentary proofs, and, when found to bear the appearance of validity and integrity, should be entitled to high regard; but it may, as in other cases, be vitiated by the faults and irregularities which tend to discredit it. It has been properly held that mere irregularities, when there is no reason to infer that the election officers have acted in bad faith will not invalidate the returns. *Boileau's Case,* 2 Parsons, 503. Nor will the mere neglect of directory requirements produce that effect. It is essential, however, that evidence of so great importance should exhibit those marks of care in its preparation, without which it may be rendered less efficient or entirely unreliable. Utter disregard of the requirements of the law, in the recording of votes or in the preparation of the returns, amounting to strong evidence of bad faith upon the part of the officers, ought to and will have the effect of destroying such returns as evidence. 'Hence,' says Judge King,, in *Boileau's Case,* 'in all cases in which the irregularities in conducting an election are not of a flagrant character, we are required to look into its good faith and integrity and, if they are manifest, we are not to defeat the expression of the popular will because of some slip in the minor details of the election, which

does not prevent our ready ascertainment of what that will truly is. Although in a case where it is shown, in making the preparatory arrangements for holding the election, a reckless disregard of, or a criminal carelessness as to, the direction of the law has been manifested, we would hold such election undue and illegal.' "

On page 774 of 10 Amer. & Eng. Enc. Law (2d Ed.) it is said:

"Fraud does not invalidate the legal votes cast; but by destroying the presumption of the correctness of the returns, it makes it necessary that any person who claims any benefit from the votes shall prove .them, and where no proof is offered, and the frauds are of such character that the correct vote cannot be determined, the return of the precinct will be rejected."

In *Jones v. Glidewell,* 53 Ark. 161, 13 S. W. 723, 7 L. R. A. 831, it is said:

"It is a serious thing to cast out the votes of innocent electors for acts done by others, and it is the province of the courts to see that every legal vote cast is counted, when the possibility exists. *Dixon v. Orr,* 49 Ark. 238, 4 S. W. 774, 4 Am. St. Rep. 42. But the rule obtains in elections, as in other affairs, that a man shall not profit by his own wrong, nor by that of others done to allow him to' reap the benefit. The only means by which approximate justice may be reached, when the illegal acts render the result doubtful, is to require the party, to whose benefit they inure, to purge the poll of their effect, or suffer the penalty of having its majority excluded from the count of his votes."

In *Londoner v. People,* 15 Colo. 557, 26 Pac. 135, it is said:

"But the rejection of the returns from the three precincts named did not necessarily defeat respondent's election. The burden of proof then shifted, and it developed upon him to establish, by evidence *aliunde,* that, nothwithstanding the illegal voting and other frauds proven, a sufficient number of legal ballots were cast for him to insure his success. Mechem, Pub. Off. § 229; McCrary, Elec. § 535. We are not advised, however, that he offered any extrinsic proofs whatever for the purpose of discharging this burden."

See, also, *Heyfron v. Mahoney,* 9 Mont. 497, 24 Pac. 93, 18 Am. St. Rep. 757, and *Attorney General v. May, supra.*

It appears 'that over two-thirds of the votes cast at this precinct should be rejected on the ground that the voter, contrary to

the plain, mandatory provision of the statute, delivered his ballot to the pollbook holder, when the same should have been delivered to the inspector or election judge temporarily acting as such, and there is evidence in this record from which it may be found that this was willfully done by all such electors, and it further having been found by the court that almost every provision of law, whether directory or not, relating to the holding of such election, excepting time and place, had been willfully and flagrantly violated, when all of these things are considered together, we are not prepared to say that the conclusion reached by the lower court was erroneous, and therefore its judgment is, accordingly, affirmed.

Dunn, Hayes and Turner, JJ., concur; Kane, C. J., concurs in the conclusion reached.