TENNIS HATFIELD v. EMMET F. SCAGGS

*Contest for Office Sheriff, Logan County.*

(No. 5665.)

*Reversed.*

IRA P. HAGER v. JOHN CHAFIN.

*Contest for Office Prosecuting Attorney, Logan County.*

(No. 5666.)

*Affirmed.*

J. G. HUNTER v. ELMO GORE.

*Contest for Office Assessor, Logan County.*

(No. 5667.)

*Reversed.*

A. D. COOK v. J. N. SCHWEITZER.

*Contest for Office Commissioner County Court, Logan County.*

(No. 5668.)

*Reversed.*

ERNEST THOMPSON v. G. F. GORE.

*Contest for Office Justice of Peace, Logan County.*

(No. 5669.)

*Affirmed.*

I. M. CONLEY v. SIMP THOMPSON.

*Contest for Office Justice of Peace, Logan County.*

(No. 5670.)

*Reversed.*

K. P. NOWLAN v. J. W. BECKETT

*Contest for Member Board of Education, Logan County,*
*Logan District.*

(No. 5671.)

*Affirmed.*

Submitted March 31, 1926.   Decided April 20, 1926.

1. ELECTIONS—*Rule Causing Voters to Vote Open Ballots Held Unconstitutional (Const. Art. 4, § 2).*

    A rule that causes voters to vote open ballots is opposed to Sec. 2, Art. 4, of the Constitution of West Virginia, which declares "the voter shall be left free to vote by either open, sealed or secret ballot, as he may elect."   (p. 431.)

    (Elections, 20 C. J. § 160 [Anno].)

2. SAME—*Commissioners of Election at Precinct Are Unauthorized to Appoint Both Poll Clerks From One of Two Political Parties Casting Largest Number of Votes at Last Preceding General Election in State, if Representative of Other Party is Available as Poll Clerk (Code, c. 3, § 8).*

    Under Sec. 8, Ch. 3, Code, the Commissioners of election at a precinct are unauthorized to appoint both poll clerks from one of the two political parties which cast the largest number of votes at the last preceding general election in the state, if a representative of the other party is present and available for service as poll clerk.   (p. 430.)

    (Elections, 20 C. J. § 73.)

3. SAME—*Where, Through Intimidation, or Because of Gross Inefficiency and Misconduct of Election Officials, Freedom of Suffrage is Interfered With, Rendering Result of Elec-*

*tion at Precinct Doubtful, Entire Poll of Such Precinct Will be Discarded; In Election Contest, Evidence of Intimidation of Voters Causing Election at Such Precinct to be Doubtful Held to Justify Discarding Entire Vote of Such Precinct.*

When by intimidation, or because of gross inefficiency or misconduct by the election officials, the freedom of suffrage is interferred with to such an extent as to render doubtful the result of the election at a precinct, the entire poll of such precinct will be discarded.    (p. 438.)

(Elections, 20 C. J. § 230.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Logan County.

Election contests for county offices by Tennis Hatfield against Emmett F. Scaggs, by A. D. Cook against J. N. Schweitzer, by J. G. Hunter against Elmo Gore, by I. M. Conley against Simp Thompson, by Ira P. Hager against John Chafin, by Ernest Thompson against G. F. Gore, and by J. P. Nowlan against J. W. Beckett. Judgments for contestees, and contestants bring error.

*Reversed in the first four cases, and affirmed in the others.*

*T. C. Townsend* and *M. F. Matheny, E. H. Butts,* and *England & Ritchie,* for plaintiffs in error.

*W. E. R. Byrne* and *W. R. Lilly* and *C. C. Chambers,* for defendants in error.

HATCHER, JUDGE:

The above styled cases are election contests growing out of the general election held in Logan County in 1924. At that election the contestants were the several candidates of the Republican party for the offices named and the contestees were the opposing candidates on the Democratic ticket. Certificates of election were awarded the Democratic candidates by the canvassing board of Logan County, and these contests followed such awards. The contestants allege fraud and gross irregularities in the conduct of the election, against the Democratic election officials and the representatives of the Democratic party. Evidence was taken on behalf of the

contestants and the contestees, on which both the county court and the circuit court of Logan County found for the contestees. The cases are here on writs of error granted the contestants.

The charges of contestants are both general and special. The general charge is that the Democratic election officials throughout Logan County conspired to suppress a free expression of the voters and thus defraud the Republican candidates. In support of this charge contestants point to instances of fraud and of violations of the election laws at many of the precincts which were under the control of Democratic officials.

Considerable allowance must be made for those upon whom falls the burden of holding elections. Such officials frequently are not only unacquainted with election laws, but are unschooled in business and unfitted educationally to perform the duties which they assume. Mistakes and irregularities inevitably result. Consequently election statutes are usually held to be directory, unless otherwise declared by the statute. Irregularities are tolerated when they have not resulted in the admission of illegal votes, prevented the free expression of the electors, or cast uncertainty on the result of the election.

Many of the instances relied on in support of the general charge of fraud are merely such irregularities as occur at every election, and may be attributed to ignorance rather than to premeditation. For example, "by agreement", each poll clerk at Landville precinct took a part of the ballots, and signed the name of the other, as well as his own name, thereto. The ballots were thereby rendered illegal, and contestants were thus deprived of a heavy Republican majority at that precinct. The Democratic clerk at Landville had served as an election official before, though not as receiving clerk, and the Republican clerk was without experience. The contestants contend that because of his former service the Democratic clerk knew that the statute required each clerk to sign his own name on the ballots and that his agreement with the Republican clerk would cause the vote from that precinct to be rejected. This inference does not necessarily follow. The Democratic clerk testified that he had not re-

ceived any instructions from any source to enter into this agreement. We know that similar mistakes occurred in many of the counties throughout the State at the last election. There is no direct proof of a general plan. Sporadic instances of misconduct are not alone sufficient to support a general charge of fraud.

Contestants specifically charge fraud in the conduct of the elections, and intimidation of the voters, at Shamrock, Striker and Mud Fork precincts. We will consider the precincts in the order named.

### Shamrock Precinct.

The notice of contest as to this precinct charged that the ballots were tampered with after they had been voted and counted. The evidence relates to numerous illegally cast ballots. Sec. 1 of Ch. 6, Code, requires the notice of contest to set forth the facts which cause the legality of the election to be questioned. The facts proven as to this precinct do not correspond to the facts alleged. The allegation and the proof must correspond in an election case, just as in other cases. The failure of contestees to move to quash, or to demur to the notice of contest is not a waiver of evidence which fails to tally with the allegations. Consequently, we cannot inquire into the legality of votes not attacked by the pleading. 20 C. J., par. 318, p. 237.

### Striker Precinct.

At this precinct there were 204 votes cast of which 5 were straight Republican, 196 straight Democratic, and 3 slightly mixed. There was only one Republican election official, and he was relegated to the counting board. The evidence for contestants shows that J. H. Pridemore and Cam Pridemore were the only Republican voters present when the polls were opened; that the Republican poll clerk appointed to represent the party failed to appear and that the Pridemores agreed upon J. H. Pridemore as Republican poll clerk; and that he was not permitted to serve by the Democratic Commissioners, who virtually drafted Martin White, a Democrat, to serve with the regular Democratic appointee as receiving clerk. The witnesses for contestees admit that the Pridemores were

the only Republicans present when the polls opened, but deny the testimony of the Pridemores as to the offer of J. H. Pridemore to serve as receiving clerk.

Contestees point to the finding in their favor on the evidence by both the county court and the circuit court, and invoke the rule that this court will not reverse on disputed evidence in such case, unless the finding of the inferior courts is against the weight of evidence. Recognizing the force of this argument, we will base our decision as to this precinct on the testimony of the Democratic witnesses.

T. D. E. Stollings, a Democratic Commissioner, testified that when the vacancy caused by the failure of the Republican clerk to attend was to be filled, J. H. Pridemore seemed anxious to serve in some capacity; that the officials offered to accept him as a Republican clerk but he said he was not competent to fill the place as he could not write well enough; and that he asked permission to serve as commissioner, but there was no vacancy for him in that capacity.

Julius Dingess, another Democratic Commissioner, testifying in regard to J. H. Pridemore, said, "Well, he said that— that he couldn't write well enough to serve as poll clerk, but he would work on the counting board, and some of them spoke up and said it was as easy to be—to work on the counting board as to be clerk, and he said he didn't want to work at that.—Well he went further and said let Cam be clerk and him take Cam's place on the counting board, and I don't know which one of the election officers it was, but some one spoke up and said they didn't have any right to change men from the place he was appointed for and put another man on." We might explain here that Cam did serve as clerk of the counting board.

It therefore plainly appears from the testimony of Democratic officials that Cam Pridemore, a Republican voter at that precinct, was suggested as receiving clerk to represent the Republican party, by J. H. Pridemore, the only other Republican voter present at the opening of the polls, and that this suggestion was refused. The only real difference in the effect of the testimony of the Republican and the Democratic witnesses, is as to which one of the two Pridemores was available

for the service of receiving clerk. The Republican witnesses say that J. H. Pridemore was the one, while the Democratic witnesses say that Cam Pridemore was the one. The Republican party was indubitably entitled to have a Republican serve in such an important position as receiving clerk, if a Republican was available for service. Every effort should have been exhausted to secure a Republican for this position. If there had been no Republican voter present and available, the appointment of another Democrat as clerk would have been permissible. But as a Republican voter was present and available, it was the imperative duty of the Commissioners to permit his appointment, or even draft him for this service. Sec. 8, Ch. 3, Code.

In regard to the manner of voting, Charlie Moore, a Democratic Commissioner, testified: "They were all to vote openly. That was the rule. Well, that was always the way, ever since I have been there, and I have been there about three elections." Martin White, a Democratic receiving clerk, testified that nearly all voters came in pairs; that he and the other poll clerk sat at school desks one in front of the other and that the ballots were marked openly on the desks. W. F. Butcher, another Democratic Commissioner, testified that practically all the ballots were marked by the clerks; that when the voters came in, they would either call for a ticket, or would be handed one, and then the clerks would fill out the ballots; that the great majority of the voters voted two at a time; and that when a pair of voters entered the election room, each clerk would take charge of one voter and mark his ballot for him. In response to a question as to whether the election in this precinct was "A clerk's affair", he admitted that it was.

The contestants contend that the rule requiring open voting was a rule of the Democratic Commissioners. We do not think that the evidence warrants such a construction, but it does establish the fact that it was a rule of the Democratic voters, in which the Democratic officials co-operated. It does not appear how this rule was established, or what methods were used to enforce it. The significant fact is that there was such a rule and that compliance with it was secured. Only one

Democratic voter in the precinct attempted to vote a secret ballot. Time was called on him by the Commissioners, and he then came out of the booth and voted an open ballot. Sec. 2 of Art. 4 of the Constitution of West Virginia requires that the voter "shall be left free to vote by either open or secret ballot, as he may elect." Our system of voting was designed by the Legislature to afford compliance with the Constitution and to encourage and protect the secrecy of the ballot. It is true that secrecy is the personal privilege of the voter, which he may waive, but such waiver must be voluntary and should not be the result of a *rule* among the voters of his political faith. If he vote an open ballot because of such a rule which he does not favor, he is not left free to vote as he may elect. He is voting in a manner prescribed by others. His constitutional rights are violated. Any rule, custom or practice, which defeats or tends to defeat the free and untrammelled expression of the voters, is contrary to the Constitution. "An election, to be free, must be without coercion of every description. An election must be held in strict accordance with every legal requirement as to form, yet if in point of fact the voter casts the ballot as the result of intimidation; if he is deterred from the exercise of his free will by means of any influence whatever, although there be neither violence nor physical coercion, it is not a free and equal election within the spirit of the Constitution." *DeWalt* v. *Bartley,* 146 Pa. 529, 24 Atl. 185. The purpose of the rule was obvious. It was to secure a strict adherence to the party ticket. It needs no argument to demonstrate that a Democratic voter, knowing that any departure from the strict Democratic ticket would be noted and condemned by the adherents of this rule, would feel a great hesitancy in voting a mixed ticket. The effect of the rule is shown by the fact that while in practically every other precinct in Logan County a large number of mixed ballots was cast, yet out of 199 Democratic voters in Striker precinct, only 3 dared to mix their tickets, even very slightly.

A similar situation arose in the contest of *Jones* v. *Glidewell,* reported in 53 Ark. 161. In that case it was shown that in order to enforce unanimity in the vote of the colored race,

''political societies were formed (among them) just before the election, in some of which it was resolved and in others the members were sworn to vote open or unfolded tickets''. The court found that means had been taken to enforce these resolutions, and held ''The constitutional requirements that popular elections shall be 'by ballot' and be 'free and equal' (Art. 3, Secs. 2, 3), are violated by a systematic plan to coerce voters to deposit their ballots in such a manner as to disclose their contents to bystanders.'' The election was avoided at precincts where this custom prevailed, the judge who wrote the opinion declaring: ''It is not necessary to show that a majority were actually prevented from voting, or voted against their wishes, by reason of the practice. When the wrong is flagrant and its influence diffusive, it is sufficient that it renders the result doubtful. There is no division, I think, in the authorities upon that proposition.''

Because of the refusal of the Democratic officials to secure or permit a Republican poll clerk, and because of the rule of open voting and the co-operation therein by the Democratic officials, we hold that the election in this precinct was conducted in such a way as to prevent the free expression of the will of the voters, and we therefore reject its entire vote.

### Mud Fork Precinct.

At this precinct about 700 voters were registered and about 500 votes were cast. The election was held in a school room in which there were only two voting booths. For several hours after the polls were opened, not more than two voters were permitted inside the election room at one time. Hugh Deskins, a Republican and a Deputy U. S. Marshal, was at the polls that day for the purpose of attempting to prevent violations of the law. Sometime between 9 and 10 A. M., Don Chafin and some seven or eight armed Deputy Sheriffs appeared at the voting place. Chafin was the Sheriff of the county, and the acknowledged leader of the Democratic party. Just as Chafin arrived, Deskins had requested a voter named Atkins not to enter the election room, as two ladies were then going in to vote. Chafin at once directed Atkins to go on in and vote, and according to Deskins, announced that he, Chafin, ''was running that place that day''. Chafin then

struck Deskins in the face. At the time of the blow, according to the undisputed evidence of numerous witnesses, there were several of Chafin's deputies with pistols drawn, and some with their hands on their pistols. The names of these deputies as given by the witnesses were Randolph Dials, Pat Murphy, Kenis Mounts, George Thompson, Lukie Kerry, James Macky, and Jodie Vance. Deskins offered no resistance to Chafin, but shortly afterwards deputized four citizens as his deputies, and gave to each one a pistol. Chafin and his deputies then proceeded to arrest the deputies appointed by Deskins, and lodged them in jail. One of them, a Republican named Thomas Fisher, was detained in jail until the day after the election. When arrested, Fisher had not voted, and requested of his captor permission to vote before being consigned to jail. Chafin's deputy replied to this request: ''I aint got no damned time to fool with you''. Deskins testified that he counted thirty-two voters inside the rope at one time, after Chafin took charge of the election. He further stated that he knew of two voters leaving and not voting because of the commotion raised by Chafin. James Curry, a Republican counting commissioner, testified that about the time of the trouble between Chafin and Deskins, the number of votes counted showed Skaggs 79 and Hatfield 65, and that the other candidates ran along ''pretty well in the same proportion''. After the disturbance the proportion for Skaggs and the Democratic candidates in general ran a ''whole lot higher''. The final count at this precinct gave Skaggs 299 and Hatfield 205. The majorities of the other contestees ran from 87 to 99. Curry further stated that before the trouble the colored voters had voted some Democratic and some Republican votes, but that there was a ''good bunch'' of colored men present at the time of the disturbance, and afterwards most of them voted the Democratic ticket. A voter by the name of Gideon Aldrich testified that he went to the polls after the trouble had occurred and that he counted eighteen people inside of the rope at one time. Oscar Kirk, another voter, stated that after Chafin took charge, he counted twenty-eight men inside the rope at one time, or ''sitting right in along it''. Mat Nelson voted at this precinct some time after five o'clock

in the afternoon. He stated that there was a "pretty good crowd on the inside of the ropes at that time". This witness guessed twelve or fifteen. James Dent, another voter, testified that after the disturbance there were thirty-two men inside the rope before he went in, that there were seven voters in the election room besides himself at the time he voted. This witness also stated that he heard Chafin say, after he had taken a gun from one of Deskins deputies, "If any of the rest of you fellows got any guns, you'd better bring them to me! I am handling the guns today and I am shooting straight." Janie Conley, a voter at this precinct, was absent when the trouble occurred. When she arrived she was told of the high-handed acts of Chafin and his deputies, and that "a regular war" was expected. She testified that she knew of a lady and her husband who did not come to the polls or vote on account of the disturbance. George Loggins, a Republican voter at Mud Fork, testified that he was one of the men deputized by Deskins, whom Chafin's deputies arrested; that after securing his release from jail about noon, he returned to the polls but did not vote, because "it was crowded in there, till there was too many in there for me to undertake to get in—I couldn't get in without crowding under or maybe violating the law."

Neither Chafin nor any of his deputies denied any of this evidence.

Frank Williamson, a Republican election commissioner, stated that he heard Walter Queen, a Democratic election commissioner, tell Earl Thompson, a Democratic challenger, that "the boss was out there and said to vote four at a time". Williamson then asked who the boss was, and Queen replied "Don Chafin". Williamson further stated that he protested voting more than two voters at a time because they didn't have but two booths, but that he was overruled by the Democratic officials; that he counted five voters in the election room on one occasion, and to the best of his recollection, six at another time. After they commenced voting four at a time, some of the voters marked their ballots on benches and some in the booths. Jessie Spry, a challenger for the Republican party, testified that he heard Queen make practically the same statement as the one given in the evidence of William-

son. Spry also testified that after Chafin's order, four would vote at a time and sometimes more than four; that he protested to Queen that when more than two were permitted to vote at one time the challengers could not keep up with the voters on their books; that Williamson replied that the boss had said vote four at a time, and that "he just shoved them right in". Andy Mullins saw 25 voters within the rope shortly after Chafin slapped Deskins. He and his wife, Serilda Mullins, both of whom voted open Republican ballots, testified of discourteous conduct toward them by Queen just after they had voted. Thomas Atkins, a Republican poll clerk, stated that he saw on two separate occasions that day, as many as six men in the election room at the same time. He said that the Republican officials objected to voting more than two at the same time and that the Democratic officials replied: that "it was none of their say, or something to that effect"; and that Walter Queen said that Don Chafin had instructed them to vote four at a time. Aaron Kirk, a voter of this precinct, testified that he heard Chafin call Queen out to one side where they whispered a little, and that he then heard Chafin say to Queen: "By God, this thing is not managed right; I want it managed right", and that Queen replied: "I don't know what to do to make it right", and that Chafin then said: "I will make it right", and that Chafin thereupon raised the rope around the election booth and sent in four voters at a time; and that shortly afterwards, there were from ten to fifteen within the rope. The evidence showed that when more than two voters were in the election room at a time, those outside the booths marked their ballots on the desks within the observation of others present. Freeland White, a Democratic poll clerk, did not remember seeing more than four or five voters in the election room at the same time. Queen admitted that he "hollored" from the porch to Chafin; that he could not remember the exact words of Chafin, but that from the time of his conversation with Chafin, there were four votes cast at a time. White and Queen were the only two Democrats who testified as to this precinct, and they gave no testimony in contradiction to the evidence of contestants concerning the mighty deeds of Chafin and Chafin's mighty

men. Queen did not specifically deny the remarks charged to him by the Republican witnesses. It does not appear how long Chafin remained after he assumed charge of this precinct, but the evidence shows that his deputies remained there all day.

It was the duty of the election commissioners to secure compliance with the election laws. They should have regulated the number of voters both within the rope and within the election room. They should have provided a sufficient number of booths for the accommodation of the voters. They should have performed their duties without aid from Deskins or domination by Chafin. In permitting Chafin to crowd the election room with more voters than there were booths, the opportunity for secret balloting was destroyed. The constitutional guaranty of free suffrage without espionage was thus violated. The manner in which Chafin conducted the election was illegal and it was nothing less than gross inefficiency and misconduct on the part of the Democratic Commissioners to supinely comply with Chafin's orders.

The evidence also discloses a clear case of intimidation of the voters by Chafin and his armed deputies, so far-reaching as to render doubtful what the result of the vote at this precinct would have been had there been no intimidation.

In *Pradat* v. *Ramsey,* 47 Miss. 24, the test of intimidation is stated to be whether "such disorder and tumult prevailed, as interfered with the voting and prevented balloting to that degree, as to vitiate the election." In *State ex rel. Roberts* v. *Calvert,* 98 N. C. 580, it was held that "To invalidate an election upon the ground of intimidation, the burden is upon the assailant to show that voters were kept from voting." The evidence of contestants meets the test and carries the burden prescribed. Fear is something one dislikes to admit, consequently its victims are more numerous than can be shown. Many may fear—not all will confess it. But contestants have proven that after Chafin and his men took charge of the polls, dread of them hovered like an ill-omened bird over the entire voting community. Evidence, uncontradicted, shows that because of Chafin's intimidation, some Republican voters who came to the polls refrained from vot-

ing, and that others remained away. Brave indeed would be
the precinct in which some voters would not hesitate to ap-
proach a voting place where "a regular war" was expected.
"It is the essence of free elections that the right of suffrage
should be exercised without coercion or the deterrent of any
intimidation or influence.—While the threat must be serious,
citizens are not bound to fight their way to the polls. Threats
or intimidation exist where there is a putting in fear; and
there may be a moral intimidation independent of threats or
violence or physical injury". 20 C. J. par. 230, p. 189-190.
*In re Duffy,* 4 Brewster 531, the Pennsylvania court declared
that inefficiency and reckless disregard of essential require-
ments of the law on the part of officers conducting the election
to the extent that the result of the will of the electorate was
put in doubt, worked the same result as though actual fraud
had been committed, and that in such case the entire poll
should be set aside. The law is equally well settled that if by
acts of violence legal voters of a precinct are to any consider-
able extent intimidated and prevented either from voting or
from a free expression of their choice, the entire vote of that
precinct should be discarded. The strongest judicial deterrent
to intimidation and misconduct, is the setting aside of the
advantage secured thereby. Therefore because of the ineffi-
ciency and reckless disregard of the election statutes exhibited
by the commissioners in charge of this precinct, as well as on
account of the intimidation of the voters by the Democratic
leader and his men, we feel compelled to invalidate the entire
poll of Mud Fork Precinct.

In discarding all the votes cast at both Striker and Mud
Fork Precincts, we realize that many of the electors at these
voting places are deprived of honest votes, fairly cast. We
regret this. But the fact that honest voters may lose their
votes must not stand in the way of the correction of fraud.
If so, fraud could rarely be reached in such contests. Expe-
diency demands that honest suffrages be immolated, when
their sacrifice is necessary to thwart interference by outlaws
and bullies. We agree with the Michigan court, that "The
readiest way to stop fraud and corruption at elections is to
see to it that the same is not rewarded by success; and when,

by the connivance and procurement of the election officers, the law is, in essential particulars, disregarded, so that candidates and voters lose the benefit of its protective provisions, under circumstances well calculated to produce the belief that such conduct may have changed the result from what it would otherwise have been, there is as great danger of wrong to the individual voter through counting, as excluding, the vote of the precinct.'' *Atty. Gen.* v. *Stillson,* 108 Mich. 419 (423).

After excluding from the count all the ballots from Striker and Mud Fork precincts, we find the result of said election as to the parties to these contests to be as follows: for the office of Sheriff of Logan County, Tennis Hatfield received 7102 votes, and Emmett F. Scaggs received 6992 votes; for the office of Prosecuting Attorney of Logan County, Ira P. Hager received 6881 votes, and John Chafin received 7006 votes; for the office of Assessor of Logan County, J. G. Hunter received 7023 votes, and Elmo Gore received 6820 votes; for the office of Commissioner of the County Court of Logan County, A. D. Cook received 6909 votes, and J. N. Schweitzer received 6815 votes; for the office of Justice of the Peace of Logan District of Logan County, Ernest Thompson received 4697 votes, and G. F. Gore received 4708 votes, Simp Thompson received 4666 votes, and I. M. Conley received 4734 votes; for member of the Board of Education of Logan District of Logan County, K. P. Nowlan received 4644 votes, and J. W. Beckett received 4678 votes.

Judgments will be entered in accordance with the above results.

*Judgment reversed in the first four cases, and affirmed in the others.*