Dwight WILLIAMSON, Contestee for office of Senator in Senatorial District No. 36 of the State of Oklahoma, Petitioner,

v.

STATE ELECTION BOARD of Oklahoma, consisting of Gene F. Blake, Chairman, Mather M. Eakes and Basil R. Wilson, Secretary, Respondents,

Gene C. Howard, Intervenor.

No. 42288.

Supreme Court of Oklahoma.

Jan. 6, 1967.

Johnson & Fisher, by Lewis C. Johnson, Tulsa, for petitioner.

Charles Nesbitt, Atty. Gen., of Oklahoma, Harvey H. Cody, Asst. Atty. Gen., of Oklahoma, for respondents.

Jim A. Rinehart, El Reno, for intervenor.

IRWIN, Justice.

In this original proceeding, Dwight Williamson, a candidate for the office of State Senator, Senatorial District No. 36, Tulsa County, seeks a Writ of Mandamus directing the State Election Board to certify him as being duly elected to such office in the General Election held November 8, 1966, and issue to him a Certificate of Election. The other candidate for such office, Gene C. Howard, was permitted to intervene and will be referred to as Intervenor.

## FACTS

In so far as pertinent to this proceeding, the facts may be summarized as follows: Intervenor filed a petition for a recount of the ballots cast in the above election.

On November 17th and 18th, 1966, the Tulsa County Election Board, in conjunction with the Honorable Raymond W. Graham, District Judge, and pursuant to an order of the State Election Board, conducted the recount. On November 19, 1966, the Tulsa County Election Board issued its "Findings of Fact", which, inter alia, were:

"1. That on a recount of all the voting machines in all of the precincts in Senatorial District No. 36, and a recount of all of the absentee ballots applicable to that race, the vote was as follows * * *:

| | |
|---|---|
| Gene C. Howard | 5607 |
| Dwight Williamson | 5687." |

Immediately following this portion of the "Findings", the different precincts with the number of votes each candidate received in each precinct were set forth. In precinct 72, Intervenor received 106 votes and Williamson received 85 votes. Further "Findings" with reference to the voting machines and votes cast in precinct 72, are as follows:

"2. That machine A (No. 01046) in Precinct 72, as shown by the public counter on the machine and by the official certificate of votes, had a total vote cast on it of 131.

"3. That machine A (No. 01046) showed a count of 20 for Gene C. Howard and a count of 17 for Dwight Williamson.

"4. That machine B (No. 02412) in Precinct 72, as shown by the public counter on the machine and by the official certificate of votes, had a total vote cast on it of 174.

"5. That machine B. (No. 02412) showed a count of 86 for Gene C. Howard and a count of 68 for Dwight Williamson.

"6. That there were 117 more votes cast in this Senatorial race on machine B than cast on machine A.

"7. That machine A was reported by the Precinct Officials to Seiscor Corporation, at approximately 4:00 P.M., to be inoperative in the following respect: the party selector lever would not center on the candidate's name in column 8 (in which the Senatorial race in question was located), but was operative when the individual levers were moved opposite the names.

"8. That the Inspector in Precinct 72, Beverly J. Cundiff, advised voters of this and told them that in order to vote column 8, they would have to work the individual levers, not the selector lever for the party.

"9. That machine A, being farther away from the clerk than machine B, was not used as often, or by as many voters as machine B."

For clarification of the above "Findings of Fact", Title 26 O.S.1961, § 227.1, provides that at any general election, the following categories of candidates shall be placed on separate ballots: (1) Candidates for county offices; (2) Candidates for State Offices; (3) Candidates for seats in the House of Representatives and the Senate of the United States. The record discloses that on machine "A", Column 1, contained the candidates for the U.S. Congressional races; Columns 3, 4, 5 & 6, contained the candidates for State Offices; and Columns 8, 9 & 10, contained the candidates for county offices. The contested Senatorial race in this proceeding was on the county ballot and was in Column 8.

A voter desiring to vote a complete straight party ticket by using the party selector lever to cast such vote, as distinguished from the individual selector lever, would have to employ 3 different party selector levers to vote a straight party ticket, i. e., the party selector lever for the U. S. offices, the party selector lever for the State offices and the party selector lever for the county offices.

According to the findings of the Tulsa County Election Board, machine "A" was discovered to be malfunctioning at approximately 4:00 P.M. There is no evidence that the machine had functioned properly

or had not functioned properly before that time or how many votes had been cast when the malfunction was discovered. Therefore, if a voter voted for the candidates for county offices on machine "A" by using the party selector lever, such vote may or may not have been registered for the candidates in column 8 prior to approximately 4:00 P.M.

On November 22, 1966, the Petition for Recount filed by Intervenor came on for hearing before the State Election Board and the report of the Tulsa County Election Board, designated as "Findings of Fact" was noted and taken under consideration. The State Election Board determined that the matter required further investigation before a ruling could be made and the hearing was continued.

A hearing was conducted in Tulsa on December 7, 1966, and on that date a majority of the State Election Board issued the following "Findings and Order":

"1. That Voting Machine No. 01046 in Precinct 72 failed to function properly in recording the votes cast in Senate District No. 36.

"2. That an undetermined number of votes were cast by qualified electors which were not recorded on the counter of the machine.

"3. That the number of uncounted votes could have been sufficient to change the announced results.

"4. That it is now impossible to determine the winner of this election.

"5. That the State Election Board has no further authority in this matter.
"It is therefore ordered that no Certificate of Election for State Senator in District No. 36, be issued and that the matter with all records pertaining thereto be delivered to the Oklahoma State Senate for its disposition."

The refusal of the State Election Board to issue a Certificate of Election to Williamson, forms the basis for this original proceeding.

## CONCLUSIONS

Although the parties have set forth several contentions, the basic issue presented in this original proceeding is whether the State Election Board should be directed to issue a Certificate of Election to Dwight Williamson.

This proceeding involves an election for a Legislative office and we must consider Article 5, Sec. 30, of the Oklahoma Constitution which provides:

"Each House shall be the judge of the elections, returns and qualifications of its own members, * * *."

In State ex rel. Cloud v. State Election Board, 169 Okl. 363, 36 P.2d 20, 94 A.L.R. 1007, we said that a plain and simple construction of the above constitutional proviso "forces us to the conclusion that said section has, and can have, no field of operation until after election." In Wickersham v. State Election Board, Okl., 357 P.2d 421, we said that in view of the fact that our recount statute is an integral part of our election laws, and in view of the further fact that an election is not over or final until a proper application for a recount timely filed is disposed of, there is no substantial grounds for distinguishing the right to a recount in a proper case from a right to a count of the votes in the first instance.

▊ We are of the opinion that a Certificate of Election is an integral part of our election laws whether such election involves a Legislative office or other State offices, notwithstanding Article 5, Sec. 30, of our Constitution. We are also of the opinion that if a candidate is entitled to a Certificate of Election under our election laws, and the State Election Board refuses to issue such certificate, this Court has the constitutional power and authority to enforce the election laws of our State under proper proceedings. See Sparks v. State Election Board, Okl., 392 P.2d 711. Therefore, we will assume original jurisdiction and determine the issues presented. However, in assuming jurisdiction and de-

termining the issues we are not unmindful of the constitutional proviso that "Each House shall be the judge of the elections, returns, and qualifications of its own members."

Williamson contends that the duties of the State Election Board in the instant proceeding were purely ministerial and involved no exercise of discretion and the State Election Board was without power or authority to go behind the returns certified to it by the Tulsa County Election Board.

The force and effect of Williamson's argument is that since the Tulsa County Election Board found that Williamson received 5687 votes and Intervenor Howard received 5607 votes, the State Election Board is bound by such finding, notwithstanding the "Findings of Fact" and "Transcript of the Proceedings before the Tulsa County Election Board" clearly disclose that both candidates may not have received all the votes each was entitled to receive. In other words, Williamson argues that he is entitled to a Certificate of Election although the "Findings of Fact" and "Proceedings before the Tulsa County Election Board" not only disclose that Williamson received 5687 votes and Intervenor received 5607 votes, but also disclose that machine "A" did not function properly and that neither Williamson nor Howard received the votes on machine "A" that were cast by voters voting the straight party selector lever, if in fact there were such voters; that there are 94 "unaccounted for" votes in machine "A"; and that the 94 "unaccounted for" votes exceeded the 80 vote margin between Intervenor Howard and Williamson.

Title 26 O.S.1961, § 392, which relates to recounts in general elections provides that after a written application for a recount is filed, "It shall be the duty of the State Election Board to transmit to the County Election Board or boards involved in such contest, a certified copy of all the proceedings incident to the contest involved,

in the same manner provided by the laws of this State governing State or District election recounts in primary elections."

Title 26 O.S.1961, § 391, which relates to recounts in primary elections provides for the hearing of the recount and "at the conclusion of such hearing, such county election board shall return all such proceedings together with its findings to the State Election Board *for final consideration,* and thereupon the State Election Board shall at once enter its final order thereon."

In our opinion, when a county election board makes its returns to the State Election Board for final consideration by the State Election Board as above provided, and the "Findings" and "Transcript of the Proceedings" of the county election board disclose that there may be a sufficient number of "unaccounted for" votes to change the result of the election, such board acts as a "quasi judicial body" in determining whether the returns and findings of a county election board or boards are sufficient for the State Election Board to make a final determination that one candidate or the other received the majority of the votes cast and is entitled to a Certificate of Election. See Sparks v. State Election Board, Okl., 392 P.2d 711. Being a "quasi judicial body" under such circumstances, we can not sustain Williamson's contention that the State Election Board's duties were purely ministerial and involved no exercise of discretion in the instant proceeding.

Title 26 O.S.1961, § 234, pertains to the canvass of county returns and provides in pertinent part as follows:

"* * * They [County Election Board] shall * * * when the result in both State and County contests have all been recorded from the Counters' Certificates, * * * certify the result in each State contest to the State Board, and such certificates, when properly certified to, shall be prima facie evidence of the correctness of the result in the several counties. The State Board shall, when all County Boards have reported here-

under, issue certificates of election to the candidates for all offices over which the County Board has no jurisdiction.* * *."

■ Although a county election board's certification shall be prima facie evidence of the correctness of the results, the certification in the instant proceeding was a qualified certification. In other words, it not only disclosed the number of recorded votes each received but also disclosed that there may have been a sufficient number of "unrecorded" or "unaccounted for" votes, due to the malfunctioning of the voting machine, to change the result of the election. In our opinion, that portion of the above proviso which states the "State Election Board shall * * * issue certificates of elections", pre-supposes that such board could determine which candidate received the majority of the votes cast in such election. We construe the above proviso to mean that the State Election Board shall issue a Certificate of Election if it can determine who received the majority of votes, but is not required to issue such certificate if it can not determine who received the majority of the votes cast.

The State Election Board found that (a) an undetermined number of votes were cast by qualified electors which were not recorded on the counter of the machine, (b) that the number of uncounted votes could have been sufficient to change the announced results, and (c) that it is now impossible to determine the winner of this election.

Williamson challenges these findings and contends that the record conclusively shows with mathematical certainty that Intervenor (Howard) was not and could not have been elected, and that it is possible to mathematically determine with certainty that Williamson was the successful candidate.

To sustain this contention, Williamson argues that the party lever for straight ticket voting did function properly on columns 9 and 10, and that column 8 was hooked to the same straight party lever;

that candidates in columns 9 and 10, did receive the straight party ticket vote and the most votes that any democratic candidate received in column 9 or 10 *was less than 80 votes* and if it is conceded that all of these were straight party votes and that Howard would have received all these votes, the same would be insufficient to overcome the 80 vote margin.

Williamson's argument that it can be mathematically ascertained and determined that he was the successful candidate overlooks certain basic facts concerning the number of votes cast on voting machine "A" and how such votes may have been cast.

■ The basic facts concerning the number of votes cast which must be considered are: 131 voters voted on machine "A" and only 37 votes were recorded in the Senate race, 20 votes for Intervenor and 17 votes for Williamson, which leaves 94 votes "unaccounted for". According to the "Findings" of the Tulsa County Election Board, we can not assume that either Intervenor or Williamson received any straight party ticket votes or that all the votes that either received were through the operation of the individual selector levers. Therefore, 94 electors either did not vote for either of the candidates or their votes were not recorded, or there was a combination of both non-voting and non-recording. If 81 or more of the 94 voters whose votes are "unaccounted for" had voted by activating the straight democratic party selector lever and did not place the individual candidate lever in a neutral position in the Senate race, Intervenor would have received said votes in addition to his 20 votes and would have been the successful candidate, assuming Williamson had not received any straight party votes.

The basic facts concerning how votes may have been cast on machine "A" which must be considered are: A voter could have activated the straight democratic party selector lever and attempted to make his vote effective only as to column 8 by neutraliz-

ing the individual selector levers in columns 9 and 19; or attempted to make such vote effective to the candidates in column 8 and part of the candidates in columns 9 and 10 by neutralizing the selector lever for certain candidates. As an example, in one race in column 10, one of the unopposed democratic candidates received 61 votes. It is impossible to determine whether such votes were cast by activating the straight democratic party selector lever or by activating the individual selector lever. It is possible, however, that 81 voters did activate the straight democratic party selector lever but in that particular race, 20 of the voters placed the individual selector lever in a neutral position and the unopposed candidate received only 61 votes. Also, in one race in column 9, the democratic candidate received 38 votes and the republican candidate received 75 votes. It is impossible to determine whether the 113 voters in that particular race activated the straight democratic party lever and then split their ballots, or whether such votes were cast by the individual selector levers only. It is also impossible to determine how many, if any, activated the straight democratic party lever.

We have examined the entire returns as reflected by the "Findings" and "Transcript of the Proceedings of the Tulsa County Election Board", and have analyzed the votes received by all the candidates on machine "A" and can only conclude that it is highly probable that Williamson received the majority of all the votes cast in the Senate race, which includes the 94 "unaccounted for" votes. However, since the electors may have voted a straight party ticket, a split ticket, or individual votes for all or some of the candidates, and Intervenor may not have received all the votes he was entitled to, we can not say that Williamson did in fact receive the majority of the votes cast. Therefore, we must sustain the findings of the State Election Board.

Williamson argues that the electors who voted on machine "A" in precinct 72 had plenty of opportunity and instructions on how to vote by the individual selector levers and if they became disfranchised, it was due to their own errors in not following the instructions. Williamson proposes that the electors were instructed on how to vote for individual candidates and if the voter failed to do so, it "would be a malfunction of the voter, the same as a voter who unwittingly mutilated his ballot with the same result does not get counted, but it does not affect the outcome of the election because * * * he has been a party to his own disfranchisement".

■ Title 26 O.S.1961, § 274, which relates to voting machines, prescribes that they "must be so constructed as to permit straight party voting as well as mixed or split tickets." In our opinion, when an elector votes on a voting machine, such elector is entitled to presume that such machine is constructed according to law and that such machine will function properly. If such voter does follow the instructions, and the machine does not function properly, it would not be a "malfunction of the voter".

Williamson also contends that sections 391 and 392, supra, govern this recount and are to be strictly construed; and that when the Tulsa County Election Board recounted the votes it had no authority to proceed further and make additional findings based on some theory of malfunction of a voting machine.

When an application requesting a recount is filed, the applicant challenges the correctness of the announced results of the election and, in effect, contends that he did not receive all the votes that he was entitled to receive or the announced results gave his opponent more votes than he was entitled to receive. The force and effect of Intervenor's application requesting a recount was that the announced results of the election did not include therein all the votes he was entitled to receive due to, some extent, to the malfunction of the voting machine.

The record discloses that the question as to whether or not a machine had in fact not

functioned properly and that Intervenor had not received all the votes he was entitled to receive was clearly placed in issue. The "Transcript of the Proceedings before the Tulsa County Election Board", discloses that before any evidence was introduced, Williamson entered an oral "general denial to all of the allegations of the contestant's petition, and specifically denies that there was a malfunction of any of the voting machines, and demurs to that part of the complaint which alleges a malfunction of the machine, on the grounds that if there were malfunction of any of the voting machines, the law does not provide that the vote should be thrown out due to any malfunction of a voting machine".

Whether the Tulsa County Election Board had authority to determine whether a particular voting machine or all the voting machines functioned properly, if no notice or evidence of malfunction had been brought to the attention of the election officials before the polls were closed and the machines locked is not presented in this proceeding. Here, notice of the malfunction was brought to the attention of the election officials while the polls were open and the election was in progress and the electors, at approximately 4:00 P.M., were advised that it was inoperative in certain respects. Therefore, in this particular election, the election officials knew the machine was not operative in every respect before the polls were closed and that every candidate may have not received all the votes that he was entitled to receive.

Recognizing that the object of elections is to ascertain the popular will, and not to thwart it; and to secure the rights of duly qualified electors, and not to defeat them; the Tulsa County Election Board proceeded to determine if both candidates received all the votes that each was entitled to receive. In order to make such determination, it had to examine the instruments employed in the election, whether such instruments were paper ballots or voting machines.

In our opinion, when the malfunction of a voting machine is brought to the attention of the election officials during the hours that an election is being conducted and an application requesting a recount is filed, which includes a challenge to the correctness of the results due to the malfunction of a voting machine, a county election board, under proper proceedings, may conduct an investigation concerning the alleged malfunction of the voting machines.

By virtue of Art. 5, Sec. 30, of the Constitution, our jurisdiction to determine the issues presented has been questioned and challenged. In assuming jurisdiction, we have not invaded the above constitutional proviso prescribing that "Each House shall be the judge of the elections, returns, and qualifications of its own members, * * *", but have construed the laws pertaining to the conduct of elections and the duties of election boards pertaining thereto.

Having determined that it is not possible under the record before us to determine with mathematical certainty which candidate received the majority of the votes cast in the Senatorial race under consideration, and also having determined that the State Election Board is not required to issue a Certificate of Election to either candidate if it can not determine which candidate received the majority of the votes cast, Williamson's application for Writ of Mandamus directing the State Election Board to certify him as being the duly elected candidate to the office of State Senator, Senatorial District No. 36, Tulsa County, and to issue him a Certificate of Election, is accordingly denied.

Writ Denied.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD, HODGES and LAVENDER, JJ., concur.