Ed EDMONDSON, Petitioner,

v.

The STATE of Oklahoma ex rel. Edna Mae PHELPS, Chairman, Respondents, and Henry Bellmon, Intervenor.

No. 47982.

Supreme Court of Oklahoma.

Dec. 19, 1974.

Rehearing Denied Jan. 2, 1975.

James E. Edmondson, Cox, Barr, Edmondson, Ripley & Edmondson, Norman, Thomas J. Kenan, George, Kenan, Robertson & Lindsey, John A. Claro, Barefoot, Moler & Claro, William P. Bleakley, Buck, Crabtree, Groves & Ransdell, Oklahoma City, for petitioner.

Bert McElroy, Sanders, McElroy & Carpenter, Thomas F. Golden, Walter B. Hall, Fred S. Nelson, J. Kevin Hays, Law Intern, Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Tulsa, Raymond E. Tompkins, Hanson, Peterson & Tompkins, Oklahoma City, Denzil D. Garrison, Garrison, Brown & Tice, Bartlesville, Deryl L. Gotcher, Jones, Givens, Brett, Gotcher & Doyle, Inc., for intervenor.

Pearson, Caldwell & Green by Bruce Green, Muskogee, amicus curiae.

IRWIN, Justice:

On November 5, 1974, a general statewide election was conducted in Oklahoma. Three candidates were on the ballot for the office of United States Senator: (1) Ed Edmondson (petitioner), the Democratic Party's nominee; (2) Henry Bellmon (intervenor), the Republican Party's nominee, and (3) Paul Edward Trent, an Independent.

The announced, but not yet certified, results of that election are:

Henry Bellmon .................390,997 votes
Ed Edmondson ..................387,162 votes
Paul Edward Trent .............. 13,650 votes.

Pursuant to 26 O.S.1974 Supp., § 395.2 and § 395.3, Edmondson timely filed a contest challenging the announced results of the election. Edmondson placed in issue the legality of the election as conducted in Tulsa County by use of voting machines.

Edmondson alleged, inter alia, that the voting machines used in Tulsa County were not programmed to permit straight party voting as required by 26 O.S.1971, § 274; that the candidates for the office of United States Senator were not programmed in their proper Column on the voting machine ballot as required by 26 O. S.1971, § 277(c); that erroneous and misleading instructions on voting were on the voting machines; and that by reason of these alleged irregularities the election was illegally conducted and void.

Edmondson sought an adjudication that all the votes cast in Tulsa County by use of voting machines were void. He asked that the State Election Board be prohibited from certifying Bellmon as being duly elected and issuing him a certificate of election; and that the State Election Board be ordered to certify him (Edmondson) as being duly elected and to issue him a certificate of election. In the alternative, Edmondson sought an adjudication that it was impossible to determine with mathematical certainty which candidate was duly elected, and asked that another election be conducted as provided by law.

Honorable J. Knox Byrum, Assigned District Judge, conducted a hearing in Tulsa County and rendered a judgment which, in effect, upheld the legality of the election in Tulsa County and ordered the certification of Henry Bellmon as duly elected

United States Senator and the issuance of a Certificate of Election to him.

Upon Edmondson's application to this Court, the order of the trial judge was stayed pending further order. Bellmon was authorized to intervene in these proceedings and to file briefs in support of the trial judge's judgment.

Intervenor (Bellmon) will be referred to individually as Bellmon; and he and respondent (State Election Board) will be referred to collectively as Bellmon.

In this original proceeding, Edmondson seeks to have declared void the Tulsa County election; and further seeks a Writ of Prohibition prohibiting the State Election Board (respondent) from certifying Bellmon as being duly elected to the office of United States Senator and from issuing its Certificate of Election to Bellmon. Edmondson also seeks a Writ of Mandamus directing the Board to certify him as being duly elected to the office of United States Senator and to issue to him a Certificate of Election. In the alternative, Edmondson seeks a determination by this Court that it is impossible to determine with mathematical certainty which candidate was duly elected, and asks that another election be ordered and conducted as provided by law.

The crux of Edmondson's challenge as presented to the trial court and in these proceedings is to have declared illegal and void all the votes cast by use of voting machines in Tulsa County for the office of United States Senator. The significance of the Tulsa County vote is reflected by the announced results of all votes cast in that county for each candidate.

Henry Bellmon ..................72,145 votes
Ed Edmondson ..................49,775 votes
Paul Edward Trent .............. 1,798 votes.

The above results include the absentee ballots cast in Tulsa County which were 571 for Edmondson, 1,410 for Bellmon and 39 for Trent The parties do not seem to make any distinction between the votes cast by voting machines and votes cast by absentee ballots.

A simple mathematical computation of the announced results discloses that Bellmon received 3,835 more votes state-wide than Edmondson [390,997 minus 387,162]. However, Bellmon received 22,370 more votes in Tulsa County than Edmondson [72,145 minus 49,775]. If the Tulsa County votes are declared void, Bellmon would lose his 22,370 vote margin in Tulsa County and Edmondson would have a state-wide edge of 18,535 votes [22,370 minus 3,835]. If such votes are declared void, it will be necessary to consider the applicable election laws under the factual circumstances then presented.

First, Edmondson contends that the voting machines did not permit straight party voting as required by law.

26 O.S.1971, § 274, as amended in 1971, prescribes the specifications for a voting machine. The specific language relied upon by Edmondson is italicized.

"* * * *It must be so constructed as to permit straight party voting as well as mixed or split tickets,* except that voting machines with a vertical columnar presentation of the individual candidates for office, if there are more than two (2) political parties on the ballot at a general election, shall not be programmed so as to permit straight party voting by the use of a single lever, button or other device. * * *."

The language in the above provision which is not italicized was added by the 1971 amendment. The apparent reason for the amendment is discussed later.

The following is a reasonable facsimile depicting how a part of all the voting machines were programmed. Column 3 lists part of the candidates for State offices and Column 4, not shown, contains the remaining candidates for State office. Column 6 lists the candidates for Congressional offices. Columns 7, 8, 9, 10, and 11, showing other candidates for other offices are not shown. The entire ballot is not shown because of reproduction difficulties.

| COLUMN 2 | COLUMN 3 | COLUMN 5 | COLUMN 6 |
|---|---|---|---|
| | **STATE OFFICERS** | | **CONGRESSIONAL OFFICERS** |

| | **For GOVERNOR** ✕ | | **For UNITED STATES SENATOR** ✕ |
|---|---|---|---|
| DEMOCRATIC | David Lyle Boren | DEMOCRATIC | Ed Edmondson |
| REPUBLICAN | Jim Inhofe | REPUBLICAN | Henry Bellmon |
| | | INDEPENDENT | Paul Edward Trent |

| | **For LIEUTENANT GOVERNOR** ✕ | | **For CONGRESSMAN 1st District** ✕ |
|---|---|---|---|
| DEMOCRATIC | George Nigh | DEMOCRATIC | James R. Jones |
| REPUBLICAN | Ralph E. Drews | REPUBLICAN | George Alfred Mizer, Jr. |

| | **For SECRETARY of STATE** ✕ | |
|---|---|---|
| DEMOCRATIC | John Rogers | DEMOCRATIC |
| REPUBLICAN | M. R. Chuck Walker | REPUBLICAN |

| | **For STATE AUDITOR** ✕ | |
|---|---|---|
| DEMOCRATIC | Joe Bailey Cobb | DEMOCRATIC |
| REPUBLICAN | | REPUBLICAN |

| | **For ATTORNEY GENERAL** ✕ | |
|---|---|---|
| DEMOCRATIC | Larry Derryberry | DEMOCRATIC |
| REPUBLICAN | Stephen Jones | REPUBLICAN |

| | **For STATE TREASURER** ✕ | |
|---|---|---|
| DEMOCRATIC | Leo Winters | DEMOCRATIC |
| REPUBLICAN | Earl H. Naylor | REPUBLICAN |

It is to be noticed that a single selector tab or device is placed in each of the rectangulars identifying an office. Part of the State offices are shown in Column three (3), and the Congressional offices are shown in Column (6). The parties agree that such offices should have been on separate ballots or different Columns, but disagree as to which Column the Congressional race should have been placed.

The voting machines were not programmed so as to permit a voter to select more than one candidate by merely moving into position one lever or device under a particular party's emblem.

In order for a voter to have voted a straight Democratic Party ticket on each ballot, the voter would have to move an individual selector tab next to the name of each democratic candidate, and press the "VOTE" button on the bottom of the panel. Unless a selector tab was moved next to a candidate's name, that candidate would not receive a vote.

If a voter wanted to vote for Edmondson and the democratic nominee for the U. S. House of Representatives (Jones) in Column 6, the voter would have to move individual selector tabs next to each candidate's name and press the "VOTE" button.

The parties have divergent views on whether the programming of the voting machines requiring, in effect, a separate selector tab for each office meets the requirements of § 274, prescribing that voting machines "must be so constructed as to permit straight party voting as well as mixed or split tickets."

Edmondson contends that in order to permit straight party voting it is necessary to permit a voter, in selecting his particular party and its slate of candidates on a particular ballot (such as the State or Congressional ballot) to move into position only one lever or device on each ballot under a particular party's emblem, rather than being required to move separate selector tabs or devices for each individual candidate.

Bellmon contends that § 274 does not specify in what manner a voting machine is to be "so constructed as to permit straight party voting", only that it is to be "so constructed". Bellmon argues that had the Legislature intended that straight party voting would be accomplished by using only one lever for a particular party or a slate of candidates on a particular ballot, it would have specifically set such requirement out in the statute. Bellmon cites different statutes from other jurisdictions (Alabama, Arizona, Arkansas, Connecticut, Georgia, Louisiana, Maryland and Pennsylvania) which indicate those jurisdictions specifically provide for straight party voting by the use of a single lever, device or knob.

Bellmon contends the voting machines permitted straight party voting because in order for a voter to have voted a straight Democratic ticket for the Congressional offices he would merely have to: (1) move the selector tab to a position adjacent to the symbol and name of the Democratic party and Edmondson's name for United States Senator; and (2) move the second selector tab to a position adjacent the symbol and name of the Democratic party and Jones' name for the United States House of Representatives.

Bellmon argues that the voter would have at that time made his selection for whom he wanted to vote, but his actual vote would not occur until the voter pressed the "VOTE" button on the bottom of the panel.

The trial judge found that while the voting machines did not provide for straight party voting by use of a single lever or device for each ballot (Congressional, State, etc.) may have been an irregularity, but since they did permit mixed, split or straight party voting by the use of individual selector tabs for each candidate for each office, it did not constitute such an irregularity that would vitiate or invalidate the election in Tulsa County.

Two types of voting machines were used. They were known locally as the

"amarillo" machine and the "Tulsa" machine.

The "Tulsa" machines were constructed so they could be programmed to permit straight party voting (if no more than two political parties were on a particular ballot) by moving a single lever or device on each column of a ballot under a particular party's emblem and pressing the "VOTE" button. This single lever would move individual selector tabs in that column for each office next to the selected party's nominee for that office.

Thus, the "Tulsa" voting machines were constructed so that they could have been programmed so as to permit straight party voting for the two Congressional offices by moving only one lever on the Congressional ballot. This, then, would be similar to the paper ballot system. The mechanical difference between voting a straight party United States Congressional ballot in this election on the Tulsa machines as programmed and as they allegedly should have been programmed was the moving of two (2) selector tabs instead of one (1) party lever

The "Amarillo" machines were not constructed so they could have been programmed to permit straight party voting on separate ballots, i. e., State and Congressional ballots, by moving a single lever for each ballot. These machines were constructed so they could be programmed to permit a voter, by moving one lever, to vote a straight party ticket for the entire election slate of a particular party.

Both machines could be programmed to permit mixed or split ticket voting. The Secretary of the Tulsa County Election Board, in explaining why the machines were programmed as they were, said:

"* * * our problem would have been obviously that it would have been discriminatory from one type of machine to another. One machine you would have been able to use one button to vote an entire ticket, the other machine you would have had to use each column for individual levers. That's why all the machines were programmed the same."

The 1974 General Election conducted in Tulsa County, is not the first time that Tulsa County has had problems concerning how it should conduct an election involving the use of voting machines.

The 1971 amendment to § 274, supra, which relates to the specifications of a voting machine, added the exception clause as heretofore set out and not italicized. Prior thereto, this provision read, "* * * It must be so constructed as to permit straight party voting as well as mixed or split tickets." See 1959 Session Laws, Title 26, Ch. 9, pgs. 121–124; and 26 O.S. 1961, § 274.

It seems the 1971 amendment was prompted by the following facts: In 1970, the State Election Board advised the Attorney General that Tulsa County would have a programming problem with voting machines in the November 3, 1970, General Election because the ballots would have candidates from the Democratic party, the Republican party, the American party, and in one instance, an Independent candidate; and that Tulsa County voting machines did not have the capabilities of straight party voting when more than two parties were involved.

The Attorney General was of the opinion that the Tulsa County voting machines did not meet the specifications of § 274 [1959 enactment] and that paper ballots should be used in the general election. See Opinions of the Attorney General No. 70–301. The 1971 Legislature then amended § 274, and added the exception clause referred to above.

■ The additional language contained in the 1971, amendment is not material in the case at bar That amendment is applicable only if there are more than two (2) political parties on the ballot at a general election. Trent's candidacy for United States Senator as an Independent candidate did not bring into operation the exception contained in § 274, because an In-

dependent candidate is not a member of a political party and there were only two political parties on the ballot at the general election, the Democratic and the Republican party. Bellmon challenged the constitutionality of straight party voting by a single lever when an Independent candidate is on the ballot but resolution of this issue is not necessary here.

Edmondson argues that there were a sufficient number of "Tulsa" machines to conduct the election and it was unnecessary to use the "Amarillo" machines. His theory is that only "Tulsa" machines should have been used and they all could have been programmed for straight party voting as required by law; and if the Tulsa County Election Board believed they did not have a sufficient number of "Tulsa" machines, they should have used paper ballots as they did in the 1970 General Election.

The issue here is not how the election in Tulsa County should have been conducted, but the legality of the election as conducted.

 We will now consider whether the manner in which the voting machines were programmed meets the requirements of § 274, which provides that the machines shall be so constructed as to permit straight party voting.

Prior to the enactment authorizing the use of voting machines, all votes were cast on paper ballots. 26 O.S.1971, § 227.1, provides for separate ballots for candidates for State offices, county offices, seats in the House of Representatives and the Senate of the United States, etc. A voter could vote a straight party ticket for all candidates of the same political party on a paper ballot by merely stamping the emblem below the political party of his choice. If no other markings were on the ballot, or the ballot was not mutilated, the voter would have voted, by the single stamp and placing the ballot in the ballot box, for all the candidates of that political party on the ballot.

In our opinion, when the Legislature prescribed that voting machines "must be so constructed as to permit straight party voting", it did not intend to make a distinction between "straight party voting" by paper ballots, and straight party voting by voting machines.

The second sentence of § 274 provides that: "It [a voting machine] must permit a voter to vote for any person, whose name is entitled to appear on the ballot, for any office whether or not nominated as a candidate by any party or organization."

This proviso includes not only independent candidates but the nominees of political parties, and a voter could vote a straight ticket by simply voting separately for each candidate of the same political party. The voting machines were programmed in conformity with the above proviso. If by enacting the next sentence "to permit straight party voting" the Legislature intended that "straight party voting" could be accomplished by requiring a voter to vote separately for each candidate of a political party, rather than a single lever for each ballot of candidates, such as the Congressional ballot in the case at bar, the language "to permit straight party voting" is mere surplusage.

We agree with the trial court. In order to comply with the language "to permit a straight party vote" a voting machine must be so constructed so that a voter may vote a straight party ticket by moving a single lever or device to the party of his choice on a ballot (such as the Congressional ballot) and by pressing the "VOTE" button In this connection, we notice that there were two separate columns (Columns 3 & 4) for State offices. Whether or not it would have been necessary to have the voting machine programmed so that a voter could have voted a straight party ticket for all the candidates in the two columns, by the use of a single lever, as distinguished from two levers (one for each column) to meet the requirements of § 274, is not here presented.

We hold that the voting machines in Tulsa County were not programmed so as to permit straight party voting as required by § 274, supra.

Second, Edmondson contends that the ballot for State offices and the ballot for United States Senator and House of Representatives were not programmed according to the provisions of 26 O.S.1971, § 277 (c), which he contends is mandatory and vitiates the election in Tulsa County. Edmondson argues that the office for United States Senator should have been placed on the top line of the panel in the upper left-hand corner, in Column 3, as a candidate for a National office. Sec. 277(c) provides:

> "Separate portions of the elective office panel in each voting machine shall be allocated as separate ballots in such manners as to classify separately National, State, county and local offices respectively in the order named."

26 O.S.1971, § 227.1, provides that candidates for State offices, Congressional offices, etc., shall be placed on separate ballots whenever paper ballots are used. A determination as to whether a United States Senator is a national or state officer within the provisions of our election laws would not be dispositive of these proceedings. Therefore, we will assume, arguendo, that a candidate for U. S. Senate is a candidate for a national office, and that the placement of the U. S. Congressional candidates in Column 6, instead of Column 3, where the candidates for state office were placed, conflicts with the mandatory provisions of § 277(c).

■ Third, Edmondson contends that 545 of 640 machines used for Tulsa County voting contained erroneous instructions and that this was a voting irregularity which voids the votes in Tulsa County.

The contested instructions were on the "Tulsa" machines and had been there "since they (the machines) were manufactured". These contested instructions were affixed conspicuously on the machines and told the voter how to vote a straight party ticket by using a single lever for each Column of a ballot rather than individual selector tabs.

However, since the machines were not programmed to permit straight party voting by using a single lever per column of the ballot and, in fact, no such lever was on the machines, the contested instructions were clearly erroneous.

We have held that the voting machines did not permit straight party voting as required by § 274 and that erroneous instructions on voting procedure were on the voting machines. We have also assumed, arguendo, that the candidates for the office of U. S. Senator were not programmed in their proper column on the voting machine ballot as required by § 277(c).

■ What is the effect of the above irregularities on the votes cast in Tulsa County? Edmondson argues that the irregularities individually or collectively void all votes cast in Tulsa County by voters using the voting machines.

Pursuant to the Constitution, the Legislature has prescribed the laws for conducting elections. Although election officials should not permit election irregularities, whether an irregularity or several irregularities void an election depend upon the circumstances in each particular case. An election irregularity in one election might be sufficient to void an election for one particular office but not sufficient to void the election for another office.

In Semke v. Wiles, 101 Okl. 105, 224 P. 312, we held:

> "The statutory provision as to the place of holding the election and the manner of changing the voting place are mandatory upon the officers charged with that duty, and will be strictly enforced in a direct action instituted before an election, but after the election such statutory requirements are directory, unless it appears that the failure to hold the elections at the regular place resulted in fraud and prevented the voters from giving a full and free expression of their will at the election."

In the Town of Grove v. Haskell (1909), 24 Okl. 207, 104 P. 56 at 61, the court cites with approval an Indiana case:

" * * * the Supreme Court of Indiana, in the case of Jones v. State ex rel. Wilson, 153 Ind. 440, 55 N.E. 229, said in the syllabus: 'All provisions of the election law are mandatory if enforcement is sought before the election in a direct proceeding for that purpose; but after election they should be held to be directory only, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared in the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.' "

In Baggett v. State Election Board, Okl., 501 P.2d 817, we said:

"The fact that a contestant proves that illegal ballots have been cast and the number of illegal ballots cast is sufficient to change the results of the election does not necessarily mean that the election should be declared void. If competent evidence can be introduced establishing that in spite of the illegal ballots cast, it may be determined with mathematical certainty which candidate received the majority of the legal votes cast, the State Election Board should issue its certificate of election."

In Porter v. Oklahoma City, Okl., 446 P.2d 384, we held:

"The right of a qualified elector to vote and to have his vote counted is basic and fundamental. When an election has been conducted in good faith [and] no elector has been misled, and a true and fair return of the entire election has been canvassed and made, . . . the will of the people, as indicated by their votes at such election, cannot be defeated by irregularities (particularly those resulting from some act or acts on the part of the election officials) which are not sufficient to change the results of the election."

In Williamson v. State Election Board, Okl., 431 P.2d 352, we held that if the State Election Board cannot determine with mathematical certainty which candidate received the majority of legal votes cast in an election, such Board is not required to issue a certificate of election.

Edmondson cites Rampendahl v. Crump (1909), 24 Okl. 873, 105 P. 201, as a case supporting his position. Rampendahl was a challenge by a losing candidate to the trial court's excluding the votes in one of 30 precincts. The appellant lost the election by 40 votes in 29 precincts, but won the excluded precinct 195 to 5.

The election in the excluded precinct, as described in three pages of the opinion, was quite rowdy involving numerous irregularities, most, if not all, occasioned by unruly electors NOT election officials.

The opinion distinguished between irregularities by electors and those by election officials. The former, if sufficiently irregular, should result in voiding said vote. The Court quoted with approval, from the brief of the plaintiff in error in Rampendahl, supra, 105 P., at 206.

" ' * * * it may be said that there are three elements in a popular election: First, those acts which have reference to the ballot and to the voter himself performing the act of voting; second, acts of officials and others in operating the election machinery; third, [acts of others] * * *. The provisions of the law with reference to the acts embraced within the first element are, of course, mandatory because they affect directly the ballot itself and the act of voting, the very essence of the law. The voter alone is involved, and he must act as the law prescribed or suffer the consequence. * * *.' "

The court, in affirming, relied primarily on the voters' refusal to follow the requirement that they were to "deliver the ballots [after marking and folding] to the inspector or judge temporarily acting as

inspector and such inspector shall forthwith in the presence of the voter and members of the election board and of the watchers, deposit the same in the respective ballot boxes."

Two-thirds of the voters willfully refused to give their marked ballots to the judge or inspector, giving them instead to the pollbook clerk and the voters as a whole "willfully and flagrantly violated" every provision of the election law except time and place. In upholding the trial court's exclusion of 200 votes, the court held:

"When it appears that practically not only every mandatory but also every directory provision of the laws governing the holding of the election, except that relating to time and place, have been flagrantly and willfully violated in a precinct, and the integrity of the result of such election is left in grave doubt, and the trial court thereby rejects the ballots cast at such precinct, his action will not be disturbed on review in this court."

In Sparks v. State Election Board (1964), Okl., 392 P.2d 711, the election officials in a certain precinct ran out of official ballots. The election officials permitted six voters to cast their votes on ballots identified as "sample" ballots. In upholding the validity of that election, even though "sample" ballots had been used, we said:

"No fraud or improper motive is charged, and none has resulted. No evil was intended and none has resulted. Under the circumstances presented in this case the constitutional right to vote outweighs the form of the ballot, and the sample ballots as used in this case were in fact and in law converted into acceptable and legal ballots. They reflect the will of the electors to whom they were furnished, and accurately record their votes. We must conclude they should be counted by the State Election Board and given weight."

In Wadsworth v. Neher, 138 Okl. 4, 280 P. 263, we held that in the absence of fraud, an election will not be held invalid on the ground that mandatory provisions of the state election laws have been disobeyed, unless it is expressly declared in the statute that the particular act is essential to the validity of an election or that its omission shall render it void. There are no statutory provisions which declare that failure to permit straight party voting, failure to properly program a voting machine, or failure to have proper voting instructions on a voting machine are essential to the validity of an election.

26 O.S.Supp.1974, § 395.3 is directed to election irregularities and, inter alia, provides:

"When a petition alleging irregularities other than fraud is filed, said petition must allege a sufficient number of irregularities and of such a nature as to (1) prove that the contestant is lawfully entitled to be issued a certificate of party nomination or certificate of election, or to have his name appear on the run-off primary ballot, or (2) prove that it is impossible to determine with mathematical certainty which candidates are entitled to be issued certificates of party nomination or certificates of election, or to have their names appear on the run-off primary ballot. If such allegations are not made, the petition shall be deemed frivolous by the presiding judge and shall be dismissed. * * *."

Under 26 O.S.Supp.1974, § 395.3, where fraud in an election is proved on the part of a candidate, he shall be declared ineligible for the office for which he was a candidate. There are no allegations, evidence, or contentions that any candidate was guilty of fraud or was guilty of any misconduct in the Tulsa County election. Neither are there any contentions, allegations, or evidence that any election official in programming the machines or conducting the election was guilty of any fraud, intentional wrong doing or improper motives.

Neither our statutory law nor our decisional law supports the proposition that the irregularities herein described, by themselves, or collectively, render, ipso facto, illegal and void all or any of the votes cast on the voting machines.

We hold the Tulsa County votes cast by use of the voting machines are not illegal or void.

The next issue presented concerns our statutory and decisional law governing election contests when it is clearly established that irregularities occurred in the election.

■ If it can be determined with mathematical certainty which candidate received the majority of the legal votes cast in an election, the candidate receiving such majority is entitled to be issued a certificate of election. See § 395.3, supra, and Williamson, supra.

■ The burden is upon Edmondson to prove that it is impossible to determine with mathematical certainty which candidate is entitled to be issued a certificate of election. Sec. 395.3, supra, and Gammill v. Shackelford (1970), Okl., 480 P.2d 920.

There are two classes of voters which must considered: (1) All of the voters who voted in the Tulsa County election [127,588]; and (2) only those voters who voted in the race for U. S. Senator [123,718]. These figures include absentee ballots.[1] This leaves a difference of 3,870 votes [127,588 minus 123,718] which were cast in Tulsa County election but which were not cast for United States Senator.

Although the evidence indicates that some of the 123,718 voters who voted in the United States Senate race wanted to vote a straight party ticket, Edmondson failed to establish and there is no competent evidence to support a finding that any of those voters were deprived of their right to vote or failed to vote for Edmondson because the voting machines were not programmed to permit straight party voting, or because of the erroneous instructions, or because the candidates for United States Senator were not placed in the upper left-hand Column on the machine ballot panel. Also, Edmondson failed to establish and there is no competent evidence to support a finding that of those 123,718 votes cast, Bellmon would not have received the 72,145 votes cast for him if the voting machines had been properly programmed with proper instructions, or that he received any votes because of the irregularities.

■ The above irregularities will be considered later, but must be considered in connection with this basic fact, i. e., Bellmon is entitled to the 72,145 votes cast for him in Tulsa County and this gives him 3,835 more state-wide votes than Edmondson, as the irregularities do not affect the votes actually cast in the race for United States Senator. Therefore, in considering the impact of the irregularities on the election, consideration must be given only to those votes cast in Tulsa County which were not cast in the race for United States Senator [3,870 votes].

■ Since we have determined that Bellmon is entitled to the 72,145 votes cast for him in Tulsa County and that he received 3,835 more state-wide votes than

---

1. Neither party attached much significance to the absentee ballots, so neither have we for this opinion. However, all parties agree that the absentee ballots were unaffected by the alleged irregularities so absentee votes should probably not be included as they are above. The figure for the total number of voters participating in the Tulsa County election [127,588] contains 2,055 absentee votes (the highest total of absentee ballots cast in any particular race (the Governor's race)]. Therefore, 125,533 voters participating in the Tulsa County election did so by using the voting machines and of those, 121,698 voted

in the Senate race [123,718 minus 2,020, the absentee votes cast in the Senate race]. Thus, 3,835 [125,533 minus 121,698] not 3,870 of the voters using the voting machines in Tulsa County did not vote in the Senate race. This figure [3,835] and the incredible coincidence that it is exactly equal to Bellmon's state-wide edge do not change this opinion in any way for the reasons hereinafter discussed.

The statement that 2,055 absentee ballots are included in the 127,588 figure is according to the records in the State Election Board.

Edmondson, the burden is upon Edmondson to prove that at least 3,835 of the 3,870 voters who did not vote in the United States Senate race would have voted in that race had there been no irregularities, or failed to vote because of the irregularities. See Williamson, supra. Edmondson does not have to prove that at least 3,835 voters would haved voted for him. See Baggett, supra.

Edmondson asserts that the 3,870 vote difference between the votes cast in the U. S. Senate race and all the votes cast in Tulsa County makes it impossible to determine with mathematical certainty which candidate received more state-wide votes. Edmondson cites Williamson, supra, to sustain his position.

The facts in Williamson and the facts herein are entirely different. In Williamson, 94 votes were "unaccounted for" and the 94 votes were sufficient to change the results of the election. There, because of a malfunctioning voting machine, some undetermined number of votes cast were not recorded. Ninety-four (94) electors either did not vote in the contested race, or their votes were not recorded, or there was a combination of both non-voting and non-recording. It was impossible to determine from the undisputed factual circumstances presented whether the 94 "unaccounted for" votes were cast but were not recorded because of the malfunction in the voting machines, or whether there was a combination of non-voting and non-recording. This Court did not rely on any presumptions in disposing of the issues in Williamson.

All the votes cast in Tulsa County were properly recorded and the exact number of votes cast can be determined with mathematical certainty. Edmondson, in effect, argues, that from the expert testimony presented and other evidence, he has established that, at least 3,835 fewer votes were cast in the race for United States Senator than would have been cast if there had been no irregularities.

In considering whether Edmondson established this fact, this Court

may not presume or speculate that either Edmondson or Bellmon would have received more or less votes had no irregularities existed, or received more or less votes because of the irregularities. By the same token, when a voting machine properly records all the votes cast in an election, and all the voters participating in that election do not vote in a particular race, and no competent evidence establishes why all the voters did not vote in all the races, this Court may not speculate on the voters' reasons for voting as they did.

Therefore, Edmondson is entitled to no presumption concerning why 3,870 voters participating in the Tulsa County election did not vote in the race for United States Senator. In this connection, we notice that 2,399 [127,588 minus 125,189—votes cast in the Governor's race] voters participating in the Tulsa County election did not vote in the Governor's race and 6,322 [127,588 minus 121,266—votes cast in the U. S. House of Representatives race] did not vote in the race for U. S. House of Representatives.

Further, the state-wide figures are indicative that, the fact that all participating voters do not vote in a particular race is not, by itself, unusual, or necessarily connected to any irregularities. The total number of voters who participated in the election, excluding Tulsa County was 694,438 [822,026 minus 127,588]. The total number of voters who voted in the Senate race, excluding Tulsa County, was 668,091 [791,809 minus 123,718].

Thus, 96% [668,091 divided by 694,438] of the state-wide voters excluding Tulsa County, voted in the Senate race, and 97% [123,718 divided by 127,588] of the Tulsa County voters voted in the Senate race. A larger, not smaller, percentage of Tulsa voters voted in the Senate race than did voters in the other 76 counties combined.

Did Edmondson establish by competent evidence that because of the irregularities, at least 3,835 voters who voted in Tulsa County did not vote in the race for United States Senator?

We will consider together the irregularities concerning the failure to permit straight party voting and the failure to remove erroneous instructions on the voting machines.

The erroneous instructions previously alluded to were located to the left of the "VOTE" button on the machines and read:

"PARTY–VOTING INSTRUCTIONS"
"TO VOTE A STRAIGHT TICKET:

"1. Raise lever at bottom of column until arrow or lever points to desired party.

"2. Return lever to original position.

"3. If you wish, you may split your ticket by moving any key or keys to a different party candidate.

"4. After all selections have been made, press vote button."

It is to be noticed that the above includes an instruction on split ticket voting. Also, there were other instructions on the machines. To the right of' the "VOTE" button the following further information was provided:

"VOTING INSTRUCTIONS"
"CHECK THE BALLOT.

"SEE THAT COLUMNS INDICATED BY RED LIGHT CONTAIN PROPER CANDIDATES AND ISSUES. ONLY SELECTIONS IN LIGHTED COLUMNS WILL BE RECORDED.

"MAKE SELECTIONS.

"MOVE SELECTOR KEY (X) DOWN TO CANDIDATE OR ANSWER PREFERRED. YOU MAY CHANGE YOUR SELECTION AT ANY TIME PRIOR TO PRESSING THE VOTE BUTTON. LEAVE KEYS IN SELECTED POSITION.

"AFTER ALL SELECTIONS HAVE BEEN MADE

"PRESS VOTE BUTTON

"YOU HAVE NOT VOTED UNTIL YOU HAVE PRESSED THE VOTE BUTTON."

Tulsa County has continuously used these voting machines for their elections from 1959 through 1974, with the exception of 1970 when paper ballots were used. During this period of time, the straight party levers were frequently on the machines depending on the number of candidates and parties, and on the type of election (General, Primary, etc ).

The straight party lever is a device distinctly different in size and shape from the selector tabs. The levers are allotted a grey-colored space running horizontally across the bottom of the white voting columns. To vote using the lever, the voter would have to *raise* the lever from its original position as explained in the contested instructions. All of these levers had been removed from the voting machines. To vote using the selector tabs, the voter would initially have to move them *down* to the candidate of his choice (as explained in the instructions to the right of the "VOTE" button) from the original position occupied by the tabs when the voter entered the voting booth. From their original position, the selector tabs could *not* be *raised*. Proper instructions were placed at the polling places and the erroneous instructions were on the voting machines only. The voter saw the erroneous instructions only after he entered the voting booth.

The trial judge found: "There was no testimony or evidence that any voter was denied the right to vote a mixed, split or straight party vote by reason of the machine used or the format or presentation thereon of the elective office panel. There is no evidence that any voter was disenfranchised, or misled, or deprived of his right to vote for the party or candidate of his choice."

The record will not support a finding that any voter was deprived of his right to vote in the United States Senate race or failed to vote in the race because he could not vote a straight party ticket, or because of the erroneous instructions. Although there is evidence that some voters may

have been confused by the erroneous instructions because they could not find the lever to vote a straight party ticket (the lever having been removed), the fact remains that 123,718 votes were cast and Bellmon received 72,145 of those votes.

Edmondson hypothesizes that confused voters would try to vote a straight party ticket by moving the selector tab opposite the party designation in the race for United States House of Representatives. None of the witnesses called by Edmondson testified that they were so confused or that they failed to vote, could not vote, or did not vote as they desired. 2,252 more votes were cast in Tulsa County in the United States Senate race than in the United States House of Representatives' race. We may not presume that the voters who voted for the democratic nominee for the United States House of Representatives thought they were voting a straight party ticket in both Congressional races and failed to vote in the race for United States Senator.

It is clear the Tulsa County voters split their tickets. In the Governor's race, Boren (the Democratic nominee), received 60,697 votes, and Inhofe (the Republican nominee), received 64,492. A total of 125,189 votes were cast in that race. In the United States Senate race, Bellmon received 72,145 votes; Edmondson 49,775 votes; and Trent, the Independent candidate, 1,798 votes. A total of 123,718 votes were cast for the office of United States Senator In the race for the United States House of Representatives in Tulsa County, Jones (the Democratic nominee) received 82,343 votes, and Mizer (the Republican party's nominee) received 38,923 votes. A total of 121,266 votes were cast in that race.

■ Since Edmondson failed to establish that any voter was deprived of his right to vote, or failed to vote, or did not vote in the race for United States Senator because he was not permitted to vote a straight party ticket or because of the erroneous instructions, we may not presume

that because of these irregularities that any voter failed to vote in the United States Senate race. If such presumption were made in the case at bar, in order to benefit Edmondson, we would have to presume that at least 3,835 voters out of 3,870 voters failed to vote because of the irregularities.

■ We hold that while the use of the voting machines, which did not permit straight party voting as required by statute, constitutes an irregularity, it did not constitute such an irregularity to void the election or make it impossible to determine with mathematical certainty which candidate received the greater number of state-wide votes and is entitled to a certificate of election.

We also hold the erroneous instructions did not void the election, or make it impossible to determine with mathematical certainty which candidate received more state-wide votes and entitled to a certificate of election.

■ Next, we will consider the irregularity concerning the failure to place candidates for United States Senator in the first position on the voting machines (upper left-hand corner).

The office of Governor was programmed on the panel where Edmondson contends the office of United States Senator should have been. In Tulsa County, 125,189 votes were cast for Governor; 123,718 votes for United States Senator; 121,266 votes for the House of Representatives; and 120,843 votes for Lt. Governor. It appears more people were interested in voting for Governor and United States Senator than the other two offices. However, there is only a 1,471 vote spread, or drop off, between the votes cast for Governor and the votes cast for United States Senator, or a 1.18% drop off in Tulsa County. This drop off is less than in the other 76 counties where 679,659 votes were cast for Governor and 668,091 votes were cast for United States Senator, an 11,568 vote spread or a 1.70% drop off.

Although some evidence tends to establish that more voters vote for the office in the upper left-hand panel on a voting machine, we may not presume that a certain number of voters who did not vote in the United States Senate race would have voted in that race if the Senate race had been placed in the first position on the ballot panel. In this connection, if we assumed for purpose of argument only, that had the office for United States Senator been programmed in the first column (left-hand corner of Column 3) of the voting machines, and all of the 1,471 voters who voted for Governor but did not vote for United States Senator would have voted for Edmondson, Bellmon would still have 2,364 [3,835 minus 1,471] more state-wide votes than Edmondson.

Assuming that the failure to place the United States Senate race in the upper left-hand panel does constitute an irregularity, it is not such an irregularity as would vitiate or invalidate the Tulsa County election. This irregularity does not make it impossible to determine with mathematical certainty which candidate received the greater number of state-wide votes and is entitled to a certificate of election.

Considering the irregularities together and their cumulative effect, Edmondson simply failed to establish by competent evidence that these irregularities singularly or together caused at least 3,835 voters who participated in the Tulsa County election to forego or fail to record a vote in the United States Senate race. Since Edmondson did not present sufficient evidence to establish this essential fact, and since the Court may not indulge in presumptions, the candidate receiving the most state-wide votes for the office of United States Senator can be determined with mathematical certainty and that candidate is entitled to be issued a Certificate of Election Bellmon is that candidate.

■ 26 O.S.1974 Supp. § 395.2 provides that the judgment of the trial court on certain issues in recounts shall be final and conclusive; and § 395.3, which pertains to challenges based on fraud and other irregularities, provides that the decision of the trial judge shall be final. Bellmon contends this Court does not have jurisdiction and this proceeding should be dismissed. Bellmon cites cases involving appeals as distinguished from original proceedings wherein Writs of Prohibition or Writs of Mandamus, or of similar nature, are presented.

In Sparks v. State Election Board, Okl., 392 P.2d 711, we said:

"In Art. 7, Sec. 2, Okla.Const. (presently Art. 7, § 4), it is provided in part:

"'* * * The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law. The Supreme Court shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and such other remedial writs, as may be provided by law, and to hear and determine the same; * * *.'"

"In Looney v. County Election Board, 146 Okl. 207, 210, 293 P. 1056, 1059, we held:

"'The Legislature cannot deprive this court of its right of superintending control over inferior courts, commissions, and boards which are exercising judicial or quasi judicial authority as granted by section 2, article 7, of the Constitution of this state; but this superintending control is exercised, not by appeal, nor proceedings in the nature thereof, but by the issuance of remedial writs, named in the Constitution, and such others as may be provided by law.'"

"Mandamus is one of the writs authorized by Art. 7, Sec. 2, supra, as a 'remedial' writ, and the final interpretation of a statute, as applied to stipulated facts, authorizes the exercise of judicial authority."

We hold that this Court does have jurisdiction to determine the issues presented in this original proceeding and we assume original jurisdiction.

Application to assume original jurisdiction granted; Stay order vacated; Application for Writ of Prohibition denied; and Application for Writ of Mandamus denied.

DAVISON, C. J., WILLIAMS, V. C. J., BERRY and BARNES, JJ., and BACON, ROMANG, HERT and BROCK, Special Justices, concur.

Justice RALPH B. HODGES, Justice ROBERT E. LAVENDER, Justice ROBERT D. SIMMS and Justice JOHN B. DOOLIN, having certified their disqualifications in the above cause, the Honorable KENNETH D. BACON, Judge of the Court of Appeals; Honorable RICHARD E. ROMANG, Judge of the Court of Appeals; Honorable ROBERT L. HERT, District Judge; and Honorable JACK L. BROCK, District Judge, were appointed Special Justices to serve in their stead.